## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| T.N.  INCORPORATION, LTD, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO.  18-5552 |
| | : | |
| FIDELITY NATIONAL | : | |
| INFORMATION SERVICES, INC., | : | |
| FIDELITY NATIONAL | : | |
| INFORMATION SERVICES, | : | |
| (NETHERLANDS) B.V., FIDELITY | : | |
| INFORMATION SERVICES | : | |
| (THAILAND) LTD., AND FIDELITY | : | |
| INFORMATION SERVICES, LLC, | : | |
| Defendants. | : | |

## <u>OPINION</u>

This dispute concerns contracts between, on the one hand, Plaintiff T.N. Incorporation

Ltd. ("TNI") and, on the other, Defendants Fidelity Information Services, LLC, Fidelity

Information Services (Netherlands) B.V., and Fidelity Information Services (Thailand) Ltd.

(collectively, "FIS"), regarding the implementation and distribution of core banking software to

banks in Thailand.  The parties have exchanged numerous expert reports, most of which are the

subject of a motion to exclude.  TNI seeks to exclude: the report of FIS's foreign law expert,

Somchai Ratanachueskul; FIS's licensing expert, Michael Lasinski; its software expert, Jeffrey

Walton; as well as its damages expert, Michele Riley.  Meanwhile, FIS seeks to exclude the

report and declaration of Rachod Intraha, one of TNI's software experts; as well as TNI's other

software (and licensing) expert, Monty Myers.

## I.    BACKGROUND

In September of 2001, FIS's predecessor, Sanchez Computer Associates, LLC ("Sanchez") and TNI entered into three contracts pursuant to which TNI agreed to implement and distribute Sanchez's Profile Software to government banks in Thailand:  the Systems Integration and Distribution Agreement ("SIDA"), the Software License Agreement ("SLA"), and the Master Agreement for Consulting Services ("MACS") (collectively, "the Agreements"). The Profile Software is a core banking software used by global financial institutions worldwide. FIS acquired Sanchez in 2004; as a result, it obtained all of Sanchez's rights to the Profile Software, and its affiliates became the successors to the Agreements with TNI.

To implement the Profile Software in Thai banks, TNI developed a software which it calls the "TNI Business Solutions" ("the TBS Software").  After the parties were unable to agree on renewal of the Agreements in 2017, TNI returned to FIS the source code for the Profile Software.  But TNI refused to return the source code underlying the TBS Software, which it now claims it owns pursuant to a provision in the Agreements that disclaims FIS's ownership of software that is, *inter alia*, "capable of running independently of the Licensed Software."

TNI filed this lawsuit against FIS seeking, among other things, a declaratory judgment that it owns the TBS Software, and is authorized to continue servicing the Profile Software for its current bank customers.  By way of counterclaims, FIS asserts, *inter alia*, that it is the rightful owner of the TBS Software under the Agreements because the TBS Software is a "derivative work" of the Profile Software.

On February 27, 2020, the parties jointly moved, and the Court agreed, to bifurcate the

2

proceedings such that claims relating to breach of contract, to technology ownership, and to

TNI's right to provide consulting services be decided first (Phase 1), before taking any action on

the remaining claims (Phase 2).  Phase 1 consists of:  (1) TNI's request for a declaratory

judgment that it is authorized to provide consulting services to its bank customers regarding the

Profile Software and the TBS Software; (2) TNI's request for a declaratory judgment that it owns

the TBS Software; (3) TNI's breach of contract claim; (4) FIS's request for a declaratory

judgment that it owns the Profile Software and the TBS Software; (5) FIS's request for a

declaratory judgment that TNI has no right to use the Profile Software or the TBS Software; (6)

FIS's request for a declaratory judgment that FIS has not breached any agreements; and, (7) four

of FIS's breach of contract claims.

## II.     STANDARD OF REVIEW

Many of the motions at issue here are propounded pursuant to *Daubert v. Merrell Dow*

*Pharms., Inc.*, 509 U.S. 579 (1993).  The *Daubert* standard is codified in Federal Rule of

Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if:  (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine a fact
> in issue; (b) the testimony is based on sufficient facts or data; (c) the
> testimony is the product of reliable principles and methods; and (d) the
> expert has reliably applied the principles and methods to the facts of the
> case.

Fed. R. Evid. 702.  This rule "embodies a trilogy of restrictions on expert testimony:

qualification, reliability, and fit."  *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396,

404 (3d Cir. 2003).

3

To satisfy the qualification requirement, an expert must possess "specialized knowledge regarding the area of testimony." *Betterbox Comm'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327 (3d Cir. 2002) (quotation marks and citation omitted). "The basis of this specialized knowledge can be practical experience as well as academic training and credentials." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quotation marks and citations omitted). The qualification requirement is interpreted "liberally," *Pineda v. Ford Motor Co*., 520 F.3d 237, 244 (3d Cir. 2008), and "a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 741 (3d Cir. 1994) (citation omitted).

To satisfy the reliability requirement, "the expert must have good grounds for his or her belief," not "subjective belief or unsupported speculation." *Id.* at 742 (quotation marks and citation omitted). "The reliability analysis applies to all aspects of an expert's testimony:  the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion." *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 155 (3d Cir. 1999). When assessing reliability, a court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Oddi v. Ford Motor Co.,* 234 F.3d 136, 146 (3d Cir. 2000). "A court may conclude that there is simply too great a gap between the data and the opinion proffered." *Id.*

*Daubert* offers multiple factors to evaluate reliability, including, *inter alia*, "whether the method is generally accepted" and "whether a method consists of a testable hypothesis." *Paoli*, 35 F.3d at 742 n.8 (citations omitted). However, "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness," and parties seeking introduction of expert evidence do not "have to prove their case twice—they do not have to demonstrate to the judge by

a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Id.* at 744. Moreover, there is "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and the "reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (citation omitted).

The last requirement of Rule 702 demands that "expert testimony . . . fit the issues in the case." *Schneider*, 320 F.3d at 404. "In assessing whether an expert's proposed testimony fits, [courts assess] whether the expert testimony proffered is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Schiff*, 602 F.3d at 173 (quotation marks, ellipses, and citation omitted). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quotation marks and citations omitted).

Finally, although trial courts must act as gatekeepers to ensure the relevance and reliability of all expert testimony, *Kumho*, 526 U.S. at 147, this gatekeeping obligation "is not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702, advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

When a party challenges an expert's opinions pursuant to Rule 702, the proffering party bears the burden of demonstrating by a preponderance of the evidence that the opinions of its proposed expert are admissible. *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417-18 (3d Cir.

5

1999).[1]

## II.      DISCUSSION

### A.  The Ratanachueskul Report

FIS offers the expert report of Somchai Ratanachueskul to "provide certain analysis and opinions related to Thai law and custom."  Principally, Ratanachueskul opines that under Thai law, TNI is no longer authorized to service the Profile Software to its Thai bank customers.  TNI moves to strike Ratanachueskul's report as an improper rebuttal under Federal Rule of Civil Procedure 26.  It also seeks to strike the report on grounds that FIS did not properly notify "by a pleading or other writing" that it intended to raise an issue of foreign law as required by Federal Rule of Civil Procedure 44.1, which provides in relevant part:  "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing."

This is not the first time that the question of whether Thai law has any application to this matter has arisen.  When the parties filed their Joint Partially Agreed Motion to Bifurcate in February 2020, they provided a series of reasons for the need to bifurcate, including that "the Phase 1 claims are governed by Pennsylvania law, while FIS believes many of the Phase 2 Claims are governed by Thai law."  If either party had held the view at that time that Thai law, in addition to Pennsylvania law, might have some application to Phase 1, it should have so noticed the Court and its opponent at that time per Rule 44.1.  Instead, both parties made clear to the Court their view that Phase 1 claims are governed by Pennsylvania law.

---

[1] The parties have styled some of their motions as "Motions to Exclude" expert testimony, and others as "Motions to Strike . . . Or In the Alternative, to Exclude" testimony.  To the extent that the motion (regardless of its label) is premised on *Daubert* it will be analyzed using the *Daubert* framework.  Where a motion is premised on a failure to comply with a Federal Rule of Civil Procedure it will be analyzed under the jurisprudential framework pertinent to that rule.

According to FIS, however, matters changed upon learning from TNI on the day that expert reports were due that TNI's Chief Executive Officer, Vigrom Chaisinthop, would provide lay witness testimony during trial regarding "Thai banking industry practices" and "customary business practices in Thailand."  Specifically, he would testify that:  (1) "usually [Thai banks] have the decision to whom they want to do the maintenance work"; (2) no vendor, you know, would argue with the customer, which is—who are the banks"; and, (3) "It's a practice in Thailand—you know, you cannot get, a copy of the source code out of the bank because each bank there is—they are specific requirements, and it's a trade secret.  So we never have any source code, you know, from the bank."  FIS contends that on learning the subject matter of Chaisinthop's proposed lay testimony, it "had no choice but to serve Dr. Ratanachueskul's report in rebuttal to that proposed testimony."

But a review of the allegations in the Complaint makes it clear that the issue of whether TNI could continue to service its Thai banking customers after its schism from FIS was front and center of the dispute from the outset.  By way of example, paragraph 132 of the initial Complaint filed in this case states:  "FIS . . . assert[s] that TNI is no longer permitted to provide consulting services to Thai banking customers for which it previously provided implementation and software maintenance services for the Profile Software"; similarly, paragraph 133 of the initial Complaint alleges that:  "To the extent that any Thai banking customers have a license to the Profile Software, such banking customer has the right to have the Profile Software serviced on its behalf by the party of its choosing."  These allegations were repeated in paragraphs 149 and 150 of the Amended Complaint filed in January 2020.  In short, it was clear from the very start of this case that the matters which TNI indicated that Chaisinthop would offer as a lay opinion would be

7

relevant to the Phase 1 litigation.  To the extent that FIS construes Ratanachueskul's opinions to be premised on his reading of Thai law, the relevance of such law was "apparent from the outset" and notice should have been given much earlier in the proceedings.  *See* Fed. R. Civ. P. 44.1 advisory committee's note to 1966 amendment.

TNI next argues that Ratanachueskul's report is not a rebuttal report because "the report goes well beyond contradicting and rebutting and is more accurately classified as an initial expert report."  TNI is correct.  An expert rebuttal report is "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)." Fed. R. Civ. P. 26(a)(2)(D)(ii).  As a preliminary matter, Chaisinthop was identified as someone who would provide <u>lay opinion</u> testimony under Federal Rule of Evidence 701: he was not identified as a witness "retained or specially employed to provide <u>expert</u> testimony in the case," Fed. R. Civ. P 26(a)(2)(B) (emphasis added), nor does he fall within the rubric of Rule 26(a)(2)(C).  Fed. R. Civ. P. 26(a)(2)(C) (describing disclosures required of experts who do not provide a written report).  Thus, Ratanachueskul's report will  be excluded.[2]

## B.  The Intraha Report and Declaration

TNI offers the opinion of its software expert, Rachod Intraha, for the proposition that the TBS Software is capable of working with core banking software other than the Profile Software. FIS moves to exclude Intraha's report on the bases that it relies on improperly precluded source code and that his methodology is unreliable.  FIS also moves to exclude a declaration by Intraha that TNI attached to its motion for summary judgment.

---

[2] TNI also moved to strike the Ratanachueskul report for failure to satisfy the standard for methodological reliability under *Daubert*.  Given that the report will be excluded because of FIS's failure to comply with the procedural requirements of the Federal Rules of Civil Procedure, that argument need not be addressed.

i.   *The Intraha Report*

FIS first argues that the Intraha report must be excluded because it relies improperly on precluded evidence.  During discovery, the parties engaged in a months-long dispute regarding production of seven source code modules that underly the TBS Software:  TN1, TN2, TN3, TN4, TN5, TN6, and TN7.  Eventually, TNI produced TN5 and TN6 to FIS, but refused to provide the remaining modules to FIS's technical experts for inspection.  After a conference call with the Court during which TNI confirmed that it was unwilling to produce the remaining modules, the Court granted FIS's Motion to Preclude Unproduced Source Code, which barred the use of TN1-TN4 and TN7 "at trial or for any other purpose" as a sanction for TNI's repeated failure to make the source code available to FIS during discovery.

Nevertheless, the Intraha report clearly relies on the excluded source code.  In opining that TN1 and TN2 can work with other core banking software and that TN3 and TN7 can be configured to do the same, Intraha bases his opinions on his understanding of those modules, which he is not permitted to do.[3]  Accordingly, to the extent that his opinion is based on his understanding or recollection of modules TN1-4 and TN7 it will be excluded.

This leaves Intraha's opinions on TN5 and TN6.  FIS argues that Intraha's opinions

---

[3] TNI's assertion that Intraha did not rely on the precluded source code in drafting his report is also contradicted by the report itself.  Appendix B of the report, titled "Materials Relied Upon," incorporates an "Appendix C."  That "Appendix C" lists each of the relevant TBS Software modules, including those that Plaintiffs were precluded from using by court order.

TNI's distinction between "source code" and "software," arguing that Intraha relied on his "general recollection of the [TBS] 'software'" in making his opinions, but not the precluded TBS Software "source code," is unhelpful, as software is comprised of source code.  *See* Richard Stim, *Patent, Copyright & Trademark* 311 (15 ed. 2017) ("Source code refers to the program code in which a programmer writes a software program."); *see also Whelan Assocs., Inc. v. Jaslow Dental Lab'y, Inc.*, 797 F.2d 1222, 1230 (3d Cir. 1986) (explaining that writing source code is a step in creating a computer program).

should be excluded because they do not pass muster under the reliability prong of *Daubert*. To be reliable, "the expert must have good grounds for his or her belief," not "subjective belief or unsupported speculation." *Paoli*, 35 F.3d at 742 (quotation marks and citation omitted). FIS argues that Intraha's report is unreliable because it relies heavily on speculation about what could be done to certain components of the TBS Software to make it compatible with other core banking software, without explaining how. In other words, FIS argues that "there is simply too great a gap between the data and the opinion proffered." *Oddi*, 234 F.3d at 146.

Intraha opines that the TBS Software (now just TN5 and TN6 of the TBS Software) could work with core banking software other than the Profile Software, through the use of application programming interface code, or "APIs." "APIs are bits of software that interface with programs to trigger software functions." Richard Stim*, Patent, Copyright & Trademark* 182 (15 ed. 2017) (discussing APIs). Essentially, Intraha's conclusion is that APIs would serve as a "bridge" to connect the TBS Software modules to the other core banking software, thus permitting the TBS Software modules to operate on a core banking software other than the Profile Software.

The problem with Intraha's analysis is that it relies almost entirely on conclusory statements with little explanation to assist the trier of fact. In concluding that "[i]nteractions between [the TBS Software modules] . . . and core banking software can be carried out through APIs," Intraha merely: (1) identifies the type of source code language used to develop these modules; and, (2) concludes without analysis or explanation that interactions between those modules and other core banking software "can" be accomplished. The report is riddled with speculative statements such as "Components in . . . TN5 can be analyzed by developers" and

"Technical consultants . . . will design the proper APIs."  The report includes diagrams purportedly depicting that such interactions are possible, again with no analysis or explanation.

In sum, Intraha has not shown how his conclusions "could reliably flow from the facts known to [him] and the methodology used."  *Oddi v. Ford Motor Co*., 234 F.3d at 146.  His entire report is essentially a list of conclusory statements that amount to his ultimate conclusion that APIs may permit the TBS Software to operate on software other than the Profile Software.  In the absence of a reliable methodology that would be helpful to the trier of fact, and its reliance on precluded software modules, Intraha's report must be excluded in its entirety.  *Paoli*, 35 F.3d at 742.

### ii.     *The Intraha Declaration*

Nearly four months after the deadline for submitting expert reports, TNI submitted as an attachment to its Motion for Summary Judgment a declaration made by Intraha.  The declaration, while in many ways mirroring his initial report, provides new opinions attempting to explain in greater detail how APIs could be used to permit the TBS Software to work with other core banking systems.  It also includes an expanded discussion of topics only briefly mentioned in his original report, as well as arguments designed to rebut the contents of Jeffrey Walton's report.[4]

Such supplementation in the guise of a declaration is improper at this stage of the litigation.  TNI's submission of what is essentially a rebuttal report attached to a motion for summary judgment is untimely and will therefore be stricken.  *See* ECF No. 123 (requiring submission of rebuttal reports on June 30, 2021); Fed. R. Civ. P. 16(f) (permitting exclusion

---

[4] Walton is FIS's software expert.  His report is discussed *infra*.

when a party "fails to obey a scheduling order or other pretrial order"); *see, e.g., Cradle IP, LLC v. Tex. Instruments, Inc*., 5 F. Supp.3d 626, 639-40 (D. Del. 2013) (providing that expert declarations and testimony that introduce new evidence or evidence that "was not vetted through discovery" can be stricken); *Waddington N. Am., Inc. v. Sabert Corp*., 2011 U.S. Dist. LEXIS 29772, at *22-23 (D.N.J. Mar. 22, 2011) (striking declaration filed "after the close of expert discovery" because the declaration "is unnecessary if it is a mere elaboration and is improper if it expresses new opinions").

### C. The Riley Report

FIS offers the opinion of Michelle Riley to assess damages in this case. Riley is a certified public accountant and consultant with experience in analyzing damages and valuation matters in the context of litigation.

As a threshold matter, TNI argues that the Riley report does not fit the needs of the case because it fails to tie damages to specific claims or attribute damages to each FIS entity. Instead, according to TNI, "Riley offers an all-or-nothing damages theory" which assumes that TNI is liable for one or more of Defendant's four breach of contract counterclaims. Presentation of damages in this manner, according to TNI, is unhelpful enough to warrant exclusion of the entire report under *Daubert*.

A close review of Riley's opinion surfaces that, quite to the contrary, Riley does not present a single lump sum of damages owed to FIS; she provides five separate dollar amounts based on her five economic theories of damages.[5] Further, she connects certain damages to

---

[5] TNI argues that Riley's failure to apportion damages among FIS entities raises standing issues in that Riley conflates the FIS entities in this litigation with their parent company, which is not a party to this litigation. Riley

specific counts of the Amended Complaint.  For example, she explains that her "lost profit from lost contracts" theory and her disgorgement analysis stem, in part, from violation of the SIDA, which is Count Five.  Given that this presentation of damages "has the potential for assisting the trier of fact," it will not be excluded on this ground.  *Schiff*, 602 F.3d at 173.

TNI next challenges the fit and reliability of each of Riley's damages theories.  For the reasons that follow, each of TNI's arguments are insufficient to warrant exclusion of her report.

### i.    *Past Lost Profits – GSB and K-Bank*

Riley's first two theories involve lost profits associated with two of TNI's bank customers, Government Savings Bank ("GSB") and K-bank.[6]  Prior to termination of the Agreements, TNI provided services to these customers in the form of maintenance of the Profile Software.  After the Agreements terminated, FIS claims that TNI continued to provide maintenance services to these customers in violation of the Agreements.  Specifically, FIS alleges that:  (1) the confidentiality provisions of the Agreements survived termination of the Agreements; and, (2) TNI breached those provisions because it used confidential information about the Profile Software to provide banks with software maintenance services.[7]  TNI argues that such a theory is untenable because "a contract that no longer exists can no longer be

---

does not do this.  She clearly explains that "each of the [FIS] plaintiffs are subsidiaries of the publicly traded parent company."

[6] Although both parties repeatedly refer to a bank customer as "K-Bank," neither provides the full name of the bank in its papers or exhibits.  Defendants have referred to a Krungthai Bank, but have referred to it as "KTB," not "K-Bank."

[7] TNI contends that FIS is arguing this theory of breach for the very first time.  It argues that while FIS's counterclaims state a claim for breach of the Agreements' confidentiality provisions, the relevant counts only tie that breach to TNI's development of the TBS Software, not to TNI's maintenance of the Profile Software for bank customers.  TNI thus concludes that Riley's opinions, which rely on this theory, should be excluded.  While TNI's argument may be entertained on a dispositive motion here, on a *Daubert* motion where Riley's opinion meets the low threshold for bare relevance, they are not well taken.

breached."  It also argues that any damages arising from TNI's provision of maintenance services are not relevant to Phase 1 of the litigation and that, accordingly, Riley's report is unhelpful to the finder of fact and warrants exclusion.

As a preliminary matter, a party may breach an obligation in the contract after its termination if clauses within the contract (such as the confidentiality obligations FIS asserts here) provide for survival of that obligation.  *See Bessemer Sys. Fed. Credit Union v. Fiserv Sols., LLC*, 472 F. Supp. 3d 142, 161 (W.D. Pa. 2020) (finding that survival clause "provides a contractual basis to find that defendant maintained a duty to protect the confidential information at issue following termination of the Master Agreement.")  Without delving into whether those obligations actually survived termination, as a general matter, experts like Riley may rely on such theories of the case in preparing their reports.  *See e.g., In re DVI, Inc. Sec. Litig*., 2014 WL 4634301, at *6 (E.D. Pa. Sept. 16, 2014) (admitting expert report that assumed defendant's liability).

Separately, Riley's analysis is relevant to Phase 1 of the litigation.  For purposes of relevance, *Daubert* has "a liberal policy of admissibility if [testimony] has the potential for assisting the trier of fact."  *Schiff,* 602 F.3d at 173 (internal quotation marks and citations omitted).  "The standard is not that high, but is higher than bare relevance."  *Id*. (internal quotation marks and citation omitted).

Here, Riley's opinions meet this low threshold and are relevant to Phase 1 of the litigation.  As discussed above, Phase 1 includes FIS's counterclaims regarding breach of the Agreements.  In paragraph 40, Riley explains the framing for her analysis by stating that "TNI is alleged to have breached each of the . . . Agreements in many ways, including but not limited to

14

(a) performance of maintenance agreements for [the] Profile Software without a license, [and] (b) disclosure of FIS confidential information, including in connection with [the TBS Software], which consists of improvements to, or customizations related to the Profile Software."[8]  Riley then calculates damages based on these assumptions.  Her opinions are "relevant for the purposes of the case and . . . assist the trier of fact" and, thus, meet the fit requirement.  *Schneider*, 320 F.3d at 404.

The remainder of TNI's arguments regarding this theory challenge the reliability of Riley's analysis, and specifically, the assumptions Riley uses to reach her numbers.  Riley calculates FIS's past lost profits by:  (1) identifying FIS's average profit margins on contracts in Thailand, either as a direct servicer or through a third party; (2) identifying the value of TNI's maintenance contracts that outlasted termination of the Agreements; (3) determining the remaining value of those contracts; and, (4) applying FIS's average profit margins to the resulting sums.

TNI first argues that Riley should not have assumed that FIS could have received these profits in the first place, because she "failed to take into consideration or provide any evidence of FIS's ability or inability to provide these [maintenance] services."  It argues that Riley's assumption that FIS could have filled TNI's shoes as a maintenance provider of the Profile Software to the Thai banks was improper and renders her analysis unreliable under *Daubert*.

---

[8] TNI argues that Riley's opinions are not appropriate for Phase 1 because she refers to TNI providing maintenance services to banks "without a license," which it construes as an opinion based on an infringement claim, not a breach of contract claim.  TNI is correct that opinions stemming from infringement claims, as opposed to breach of contract claims, belong to Phase 2, and both parties will have the opportunity at trial with this and other witnesses to object to testimony they deem to be straying into Phase 2 issues.  *See Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640, 643 n.5 (3d Cir. 1987) (upholding motion to strike expert testimony made at trial).

While a damages expert may not rely on assumptions wholly without evidence in the record, *Elcock v. Kmart Corp.*, 233 F.3d 734, 738 (3d Cir. 2000), that is not what happened here. Riley testified that FIS would have been able to provide maintenance services to these clients because it already does so in other parts of the world.  Riley also noted that FIS found a replacement for TNI in 2018, and that FIS currently provides maintenance services through that new distributor.

The fact that TNI disputes whether FIS could have provided these services is an insufficient basis to exclude the report.  That is because, as a basic principle, "an expert may "base h[er] opinion on a particular version of disputed facts and the weight to be accorded to that [expert] opinion" rests with the jury.  *See, e.g., Johnson v. Duffy*, 855 F. Supp.2d 311, 320 (M.D. Pa. 2012) (quoting *Walker v. Gordon*, 46 Fed. App'x. 691, 694-96 (3d Cir. 2002)).  In estimating profit margins, Riley relied on reports of FIS's past profits, as well as conversations with FIS's Director in Financial Planning and Analysis to generate these numbers.  TNI is free to cross-examine Riley about her assumptions, and how she arrived at her conclusions, and thereafter argue to the jury that it should reject her opinion because her version of the facts—which underpin her report—are, in its view, wrong.  *See Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination.")  In short, this dispute is not a basis to exclude the report in its entirety, because "factual disputes are for the jury."  *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig*., 2020 WL 6887885, at *37 (E.D. Pa. Nov. 24, 2020) (quoting *Walker*, 46 Fed. App'x. at 694-96).

16

TNI next argues that Riley's methodology is unreliable because she assumes that the profit margins FIS receives as a licensor would be the same as if FIS filled TNI's role as a maintenance provider.  It notes that its own profit margins from these contracts are much lower than FIS's, citing the report of its own damages expert, Megan Salehli.  These arguments go to the weight, and not the admissibility, of Riley's report, *Stecyk*, 295 F.3d at 414, and do not warranted its exclusion under *Daubert*.[9]

### ii.      Future Lost Profits – GSB

Riley's next theory is that FIS is due "future" lost profits because it would have continued receiving revenue from a renewed maintenance contract with GSB had TNI not allegedly breached the Agreements.  She calculates damages that FIS is due for profits TNI will ostensibly make for itself between 2023 and 2028.  Although the existing contract between TNI and GSB is only for services provided between 2016-2020, Riley reasons that FIS would have received revenue from renewed maintenance contracts with GSB from 2021-2028 had TNI not breached the Agreements.  TNI challenges Riley's theory on grounds that it: (1) relies on improper assumptions; and, (2) fails to consider FIS's mitigation of its damages.

First, TNI argues that Riley's calculations are too speculative because they rely on the following assumptions:  that FIS contracts are typically renewed by clients for 15-20 years; that core banking software contracts only end if the product becomes obsolete; and that the Profile Software is not obsolete and will not be prior to 2028.  TNI argues that the sole bases for these

---

[9] Citing to an alleged internal contradiction in Riley's report, TNI also argues that her opinion should be excluded for allegedly double-dipping on lost profit damages for the months of January to June 2018.  Such minute criticisms on inputs constitute challenges to the weight of the report, not the admissibility, and therefore are more appropriate to raise on cross-examination at trial.  *Stecyk*, 295 F.3d at 414.

assumptions are conversations Riley had with FIS employees, and that relying on the employees' words "falls short of the reliability requirements set forth in *Daubert*."  It cites to cases where experts relied on internal business projections without verifying the underlying bases for the projections.  *See, e.g., Legendary Art, LLC v. Godard,* 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012).

      As discussed above, expert reports do not warrant exclusion merely for relying on assumptions—they only warrant exclusion where such assumptions lack evidence or are wholly unreasonable.  *Elcock*, 233 F.3d 734 at 755.  Riley's assumption that clients typically renew contracts for 15 to 20 years stemmed from a discussion she had with FIS's Senior Vice President and Head of Sales for the Asia Pacific region, who explained that this was the case because bank customers try to avoid incurring the high implementation costs of changing core banking software.  This same executive explained to her that the most common reason for contracts to end is the obsolescence of products.  Riley's assumption that the Profile Software is not obsolete and is not likely to be before 2028 stems from an interview she had with FIS's Vice President and General Manager, who confirmed that the Profile Software continues to be marketed and sold, and there are no current plans to sunset or discontinue it as a product.  To actually compute the future lost profits, Riley relied on the amount of revenue generated through TNI's four-year maintenance contract with GSB.  These assumptions are reasonable enough to pass muster under *Daubert*.  *Elcock*, 233 F.3d at 755; *Paoli*, 35 F.3d at 744 (3d Cir. 1994) ("The evidentiary requirement of reliability is lower than the merits standard of correctness.")

      Further, TNI's cases in support of its position are distinguishable.  In *Legendary Art, LLC v. Godard*, the "linchpin" of the plaintiff's expert's report was a profit and loss projection

18

supplied by the plaintiff.  2012 WL 3550040, at *4.  The expert did not know how the projection was calculated, and his report assumed the validity of the numbers contained therein.  *Id.*  The court granted defendant's *Daubert* motion, noting that cross-examination of the expert would be futile, because he would not be able to answer basic questions going to the heart of the numbers upon which he relied.  *Id.* at *5.

There are a few points distinguishing *Legendary Art* from this case.  First, Riley did not rely on a forward-looking financial projection, but rather on the actual amount specified in the contract between TNI and GSB for 2016-2020.  As a threshold matter, therefore, the data upon which the report is based appears to be more reliable than that in *Legendary Art*.  Second, Riley relied on more than just this data, having spoken to multiple employees at FIS regarding typical banking software terms.  She is, therefore, equipped to answer questions on cross-examination regarding the assumptions underlying her report, providing the jury with the information to decide whether or not she is correct.  Bearing in mind that an expert's testimony "need not be without flaw, based on the best methodology, or even come to the right conclusions as long as there are still good grounds to hold those opinions," Riley's assumptions are not sufficient to warrant exclusion of her report under *Daubert*.  *See, e.g., Warren Hill, LLC v. Neptune Invs., LLC*, 2021 WL 2044389, at *7 (E.D. Pa. May 20, 2021) (citing *Paoli*, 35 F.3d at 744).

Second, TNI argues that Riley's opinions regarding her future lost profits theory should be excluded, because the damages "do not account for FIS'[s] duty to mitigate, or even consider if any actual mitigation occurred."  As a threshold matter, however, it is TNI, not FIS, that bears the burden of proving mitigation of damages in these claims.  Under Pennsylvania law, mitigation is an affirmative defense for which the defendant bears the burden of proof.  *Prusky v.*

19

*ReliaStar Life Ins. Co*., 532 F.3d 252, 258 (3d Cir. 2008).  Although TNI is the Plaintiff in this case, it is the Counterclaim-Defendant for FIS's breach of contract counterclaims.  Given that TNI has the burden to prove mitigation, Riley's purported lack of a mitigation component in her calculations is not a basis to exclude her report as "unreliable."  *See Pontiere v. James Dinert, Inc*., 627 A.2d 1204, 1209 (1993) (finding that defendant failed to meet its burden to prove that damages should be reduced); *cf. Avco Corp. v. Turn & Bank Holdings, LLC*, 2020 WL 3412659, at *15 (M.D. Pa. June 22, 2020) (holding that defendant's expert report was not excludable for failing to apportion revenues, where it was defendant's burden to do so).

### iii.    *Lost Profits from Lost Contracts*

Riley's next damages theory is based on TNI's alleged breach of the SIDA provision that obligates TNI to use its best efforts "to promote, . . . and license [the Profile Software]" and to promote "the overall reputation and goodwill" of FIS.  The theory is that FIS lost profits due to TNI's repeated refusals to assist it in bidding on projects while the Agreements were in effect.  TNI contends that Riley:  (1) relies on improper assumptions; and; (2) fails to consider the costs associated with taking on the hypothetical contracts.  Neither argument warrants exclusion of the report.

First, although Riley relied on record evidence to support her lost profit theories, including the depositions of corporate executives; emails on the subject; interrogatory responses; and interviews with FIS employees, TNI argues that she should have relied on more "reliable evidence[,] such as Request for Proposals, work orders, [and] bank communications" to support her opinions.  This quarrel goes to the weight her testimony, rather than whether her report should be excluded as deficient, *Stecyk*, 295 F.3d at 414, and is more appropriately addressed on

trial through cross-examination.

Second, TNI asserts that Riley failed to account for appropriate costs in her calculations on this theory.  TNI argues that Riley's only category of costs, "unspecified costs," are too low when viewed in light of the costs TNI's damages expert calculated for itself.  But this is another squabble about what the evidence shows, not a methodological flaw.  Riley made clear in her report and during her deposition that she considered cost-related evidence by reviewing two reports generated by FIS in the ordinary course of business.  She also testified that she discussed these reports with FIS's Director in Financial Planning and Analysis, to understand how they were prepared and other assumptions underlying the reports.

This is not an instance where a damages expert did not consider evidence of any costs. *Cf. All Seasons Home Improvement Co. v. Arch Concept Constr., Inc.*, 2018 U.S. Dist. LEXIS 138718, at *28-29 (D.N.J. Aug. 16, 2018) (noting that expert report contained "no calculation of costs.").  TNI only believes Riley should have considered more, an issue that goes—once again—to the weight, rather than the admissibility, of this damages theory.  *Paoli*, 35 F.3d at 744 (holding that a report is reliable so long as it is based on "good grounds").[10]

### iv.    *Investments in Finxact and YottaDB*

Riley's next theory involves TNI's alleged investments in two companies that FIS claims compete with its Profile Software, YottaDB and Finxact.  Riley explains that by making these investments, TNI violated the "best efforts" clause of the Agreements, which require TNI to use its best efforts to promote FIS's products.  Riley finds that FIS suffered damages in the amount

---

[10] Plaintiff's remaining arguments about this theory, including that Riley failed to consider mitigation of damages and improperly assumed a contract term of 10-15 years, have been addressed *infra*.

that TNI invested in the two entities.

TNI argues that this theory should be excluded because it incorporates unwarranted assumptions.[11]  Specifically, TNI contends that Riley should not have assumed:  (1) that TNI invested in Finxact and YottaDB at all, and, (2) that Finxact and YottaDB are competitors of FIS.

As a preliminary matter, Riley cites to record evidence for the proposition that TNI invested in these companies, including the deposition of TNI's CEO, Vigrom Chaisinthop.  She also cites to the deposition of Frank Sanchez (founder of FIS's predecessor, Sanchez Computer Associates) and other documentary evidence to support her assumption that these companies compete with FIS.  Therefore, her assumptions are not of the kind that render her analysis unreliable under *Daubert*.  *Elcock*, 233 F.3d at 755.  Further, and as discussed above, TNI's disagreement with these facts does not change the *Daubert* analysis because experts are permitted to rely on a certain version of disputed facts in executing their reports.  *Johnson*, 855 F. Supp.2d at 320.  Riley's report will therefore not be excluded on this ground.[12]

---

[11] TNI also argues that Riley does not provide "any basis as to how" TNI breached the "best efforts" clause by investing in these companies, citing to case law explaining the legal obligations imposed by such a clause.  To be clear, it is not Riley's job to make legal arguments on the merits about what TNI's obligations were under the Agreements.  Her job was to calculate damages, assuming liability.  *See e.g., In re DVI*, 2014 WL 4634301, at *6 (admitting expert report that assumes liability on the part of defendants).  Riley's report will therefore not be excluded because she did not make legal arguments to be made by FIS.

[12] TNI also argues that Riley's estimate of damages under this theory, which equates to the amount that TNI invested in Finxact and YottaDB, is speculative because "had TNI invested $10,000 or $100,000 in Finxact or YottaDB, Riley's opinion regarding the harm to FIS would still be the same arbitrary investment amount."  FIS responds that using the amount TNI invested in these companies to measure damages makes sense because "[e]ven one dollar of cash that is invested in a competing company is a dollar . . . unavailable to be used as [TNI's] working capital for efforts related to FIS. . . [t]he less working capital that is available to [TNI to] fund marketing and sales efforts for Profile . . . the less likely it is that TNI would undertake marketing and sales efforts for Profile."  TNI can question Riley about her supposedly arbitrary estimates, but these arguments do not warrant exclusion of the report under *Daubert*.  *Stecyk*, 295 F.3d at 414.  Moreover, Riley cited to deposition testimony and documents in the record when describing the amount of money TNI purportedly invested in these companies.  Her opinions are therefore

###### v.   *Disgorgement of Profits from Finxact Contract*

Riley's final theory is based on a contract TNI entered into with Finxact in May 2017, under which TNI provided certain services to Finxact, again allegedly in violation of the "best efforts" clause of the Agreements.  To estimate these damages, she performs a disgorgement-of-profits analysis on the fees Finxact paid to TNI for its services.

TNI argues incorrectly that disgorgement (*i.e.*, restitution) is not an appropriate remedy for breach of contract.  Under Pennsylvania law, "contract law espouses three distinct, yet equally important, theories of damages to remedy a breach of contract: 'expectation' damages, 'reliance' damages, and 'restitution' damages." *Atacs Corp. v. Trans World Communs.*, 155 F.3d 659, 669 (3d Cir. 1998) ("[R]estitution damages will require the party in breach to disgorge the benefit received. . . .")  Disgorgement, or damages under a theory of restitution, "provides an appropriate form of relief in many contract cases." *Id*.  Excluding Riley's damages opinion on this ground would therefore be inappropriate. *Cf. Emtec, Inc.v. Condor Tech. Sols., Inc*., 1999 WL 286474, at *4-6 (E.D. Pa. May 5, 1999) (rejecting argument to exclude report on similar grounds because disgorgement was an appropriate remedy under Virginia law).

In sum, Riley's damages analysis rests on "good grounds," and TNI's motion to exclude the Riley report will be denied in its entirety. *Paoli*, 35 F.3d at 744.

---

sufficiently tied to the (disputed) facts of this case and do not warrant exclusion on this ground, either.  *Schneider*, 320 F.3d at 404 (an opinion "fits" when "the expert testimony proffered is sufficiently tied to the facts of the case"); *Johnson v. Duffy*, 855 F. Supp.2d 311, 320 (M.D. Pa. 2012) (admitting expert testimony that relied on disputed facts).

### D.  The Myers Report

TNI offers the report of Monty G. Myers, the founder of a software development company, for what is in essence a technical analysis of the Profile Software.  It is his opinion that precisely what is included in the Profile Software as claimed to be owned by Defendant "is not adequately or reasonably defined to delineate what FIS claim[s] to own relative to what third parties may own or what is part of the public open-source domain"; that there are substantial technical deficiencies in Defendant's claims that the TBS Software is a derivative work as defined in the Software License Agreement; that certain portions of the TBS Software appear to satisfy the requirements of "Other Software" to which FIS does not assert any ownership; and, that the Profile Software was designed and built to be customizable and extensible through a variety of mechanisms allowing for a range of customization levels.

FIS seeks to strike Myers' report because it argues that, under the guise of offering technical opinions, he is in fact providing improper legal conclusions regarding contractual interpretation of the parties' Agreements, and the coverage and effect of open source license agreements.  FIS also contends that Myers impermissibly opines on the admissibility and proper scope of the report submitted by FIS's technical expert, Jeffrey Walton.  Further, FIS challenges Myers' rebuttal report as containing new, previously unmentioned conclusions that should have been included in his opening report.

As a general matter, '[a]lthough Federal Rule of Evidence 704 permits an expert witness to give expert testimony that embraces an ultimate issue to be decided by the trier of fact, an expert witness is prohibited from rendering a legal opinion.'" *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006).  In other words, experts are not permitted to explain

24

the law or render opinions on what the law requires.  *Id*. at 218.  "On the other hand, expert testimony that implicates or touches on legal issues is not per se inadmissible."  *Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co*., *LP*, 203 F. Supp.3d 499, 546 (E.D. Pa. 2016) (citing *Berckeley*, 455 F.3d at 217).  An expert may testify based on a document that has legal effect so long as he does not opine on the legal effect of the document.  *Id.*; *see, e.g., Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care*, 756 F. Supp.2d 598, 606 (D. Del. 2010) ("Dr.  Bocarsly applied the definitions from the Agreement and did not expand their legal meaning. . . .  [His] opinions were offered from the perspective of his technical knowledge and expertise. . . .").

In cases where an expert opines on the meaning of a term in a contract, courts must turn to principles of contract interpretation for guidance.  *See, e.g*., *Gen. Refractories Co. v. First State Ins. Co.*, 855 F.3d 152, 158 (3d Cir. 2017).  Under Pennsylvania law, a court must decide whether contractual terms are clear or ambiguous.  *American Eagle Outfitters v. Lyle & Scott Ltd*., 584 F.3d 575, 587 (3d Cir. 2009).  If a term is clear, the court should give effect to the language without reference to materials outside the four corners of the agreement.  *Id*.  If the term is ambiguous, the intent of the parties becomes a question for the jury, which will consider and weigh any conflicting extrinsic evidence.  *Id.*

There is, however, one notable exception to this general framework.  "Evidence of industry custom or trade usage is always relevant and admissible in construing commercial contracts and does not depend on the existence of ambiguity in an agreement to be introduced."  *Gen. Refractories Co*., 855 F.3d 152, 160 (3d Cir. 2017) (internal citations omitted).  This means that, regardless of the purported clarity or ambiguity of various contractual terms, evidence of

25

custom or trade usage is generally admitted.  *See AstenJohnson, Inc. v. Columbia Cas. Co.*, 562

F.3d 213, 221-22 (3d Cir. 2009) ("[U]nder Pennsylvania law, the District Court would be entitled

to consider trade usage . . . even if Asten's suggested reading were consistent with a literal

reading of the text of the exclusion"); *see, e.g., Nationwide Life Ins. Co. v. Commonwealth Land

Title Ins. Co.*, 2011 WL 204619, at *7 (E.D. Pa. Jan. 20, 2011) ("In other words, even absent an

ambiguity, a court may consider evidence of custom in the industry or usage in the trade").

Applying these principles here, Myers' opinions that discuss contractual terms shall, for

the most part not be excluded.  First, FIS argues that Myers improperly interprets terms in the

Agreements, such as "Derivative Works," "Capable," and "Licensed Software."  Although

Myers does dip into a discussion of certain terms of the Agreements, it does not appear that he is

doing so to provide a legal opinion as to whether TNI breached the Agreements.  He does not

render an opinion about "what the law requires."  Rather, he sets forth his view of what those

terms mean because he finds it necessary to do so in order to provide his perspective on the

technical relationship between the Profile Software and the TBS Software.

Take, for example, Myers' definition of the term "capable," which he describes as a

"scientific threshold term indicating the ability to operate in a certain way, not the requirement

that it actually operate in that certain way."  Myers assumes this definition of "capable" to

provide one of his technical opinions, which is that "several of the relevant operational

characteristics of TN6.2 can be adjusted" to run independently of the Profile Software.

Myers' definition of this term from a technical standpoint is admissible because, as discussed

above, "evidence of industry custom or trade usage is always relevant and admissible," in

interpreting a contract, and "does not depend on the existence of ambiguity in an agreement to be

introduced." *Gen. Refractories Co*., 855 F.3d at 160.  Importantly, FIS can test Myers on his definition of this term by cross-examining him at trial, as well as questioning its own technical expert, Jeffrey Walton, about why he chose not to provide a similar definition of "capable" in his own report. *Stecyk*, 295 F.3d at 414.

FIS also argues that Myers provides impermissible legal opinions on what constitutes the Profile Software and on the legal implications of open-source software licenses.  Myers opines that a person skilled in software cannot delineate which portions of the Profile Software belong to whom.  Myers bases his opinion on his technical analysis that the Profile Software "was built upon and intricately relied upon GT.M," a database engine; his review of the record evidence; and his business experience with open-source licenses.

While Myers does not definitively state who owns the Profile Software, his opinions, which place doubt on FIS's ownership, sometimes come close.  Admittedly, "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." *Berckeley*, 455 F.3d at 218 ("Key to our determination was that the expert did not give his opinion as to what was required under the law, or whether the defendant complied with the Act.")  Myers' opinions seem to rely on a combination of his technical skill and his knowledge of the customary practices in a particular industry—specifically, practices concerning open-source software licenses.  Objections at trial should Myers, during his testimony, begin to stray too close to legal conclusions, are the appropriate manner in which to address any concerns in this regard, not the exclusion of his report.

That being said, there are certain portions of the Myers report that cross the line into legal

27

analysis.  His opinion, for example, that certain language in an agreement "seems to suggest/indicate that the parties contemplated independent development and ownership of certain work product by TNI[,]" is outside of his lane lines.  *See Shire ViroPharma Inc. v. CSL Behring LLC*, 2021 U.S. Dist. LEXIS 61551, at *45 (D. Del. Mar. 31, 2021) ("it is well settled that experts may not provide testimony concerning "the state of mind" . . . of defendants, corporations, regulatory agencies, and others.").  In its briefing, FIS sets forth several more examples where Myers, in its view, offered legal conclusions about the proper interpretation of contractual terms—but suggests that there are many more, in fact so many more that they are "too numerous to catalogue in full."

Myers' testimony will be provided in the context of the legal principles set forth above: that experts can opine on industry custom and trade usage; but cannot opine on the legal effect of a document, the drafters' intent or other aspects of contract interpretation that belong squarely in the realm of law.  To the extent that counsel's questioning asks him to reach legal conclusions, the option of an objection, if well-founded, is available.  Further, should Myers venture into forbidden waters, a request to strike his testimony is a time-honored method of pulling him back to shore.  *See Benjamin*, 820 F.2d at 643 n.5 (upholding motion to strike expert testimony made at trial); *Grace v. Mauser-Werke Gmbh*, 700 F. Supp. 1383, 1388 (E.D. Pa. 1988) (discussing motion to strike expert testimony).

FIS also argues for the exclusion of Myers' rebuttal of Walton's expert report, on grounds that it is not really a rebuttal report but, rather, offers opinions that should have, but were not, addressed in his opening report.  Specifically, FIS refers to the section of Myers' rebuttal report regarding "the Profile Infrastructure Project (aka PIP)" and its alleged "close

connection to the 'Profile Software' and to Data-Qwik." While the opening Walton report mentions PIP and Data-Qwik, it does not engage in the same level of analysis regarding these issues.

Federal Rule of Civil Procedure 26(a)(2)(D)(ii) defines rebuttal experts as presenting "evidence [that] is intended solely to contradict or rebut evidence on the *same subject matter* identified by another party. . . ." Fed. R. Civ. P. 26(a)(2)(D)(ii). "Same subject matter" is not defined in the advisory committee notes to Rule 26, but the phrase has been construed more broadly than narrowly. *See, e.g., Fed. Trade Comm'n v. Innovative Designs, Inc.*, 2018 WL 3611510, at *2-3 (W.D. Pa. July 27, 2018) (collecting cases). Here, the Myers report addresses the same subject matter as the Walton report, generally, the TBS Software's technical relationship to the Profile Software. Myers' criticisms of the Walton report—including its alleged deficiencies in not further analyzing PIP and Data-Qwik—therefore fall within the proper scope of a rebuttal report.

Finally, FIS argues that Myers is attempting to usurp the gatekeeper role of the court in offering his views on the admissibility of the report drafted by FIS's technical expert, Jeffrey Walton. In short, Myers thinks that Walton's report expresses too many opinions with too little supporting technical analysis, and provides factual narratives or legal conclusions that are not properly within the purview of a technical expert witness. FIS is right. It is the role of the trial court, not expert witnesses, to act as "gatekeepers" to ensure the relevance and reliability of all expert testimony. *Kumho*, 526 U.S. at 147.

### E.  The Lasinski Report

In response to Myers' opening report on software and licensing, FIS submitted the

rebuttal report of Michael J. Lasinski to opine on certain licensing issues.  Specifically, Laskinski was asked to respond to Myers' opinions regarding the extent to which language in the Profile Agreements and course of dealings between TNI and FIS would affect the expectations of similarly situated parties regarding ownership of the TBS Software; Myers' opinions regarding the definitions of certain terms in the Agreements; and, the extent to which certain terms are defined in the Agreements such that the parties could readily delineate license and ownership rights in related source code, trade secrets and software products; and, to respond to Myers' opinions regarding open source licensing considerations.  The report also responds to Myers' contentions about the deficiencies in FIS's definition of the Profile Software, as well as Myers' contention that the Profile Software may be subject to open-source licenses.

TNI first argues that the Lasinski report is procedurally improper because it does not constitute "proper" rebuttal evidence, and therefore should have been submitted on the date of opening expert reports.  As discussed above, a rebuttal report is admissible where it will counteract the evidence of the adverse party, and courts have discretion in determining what evidence may be presented on rebuttal.  *Chrzanowski*, 502 F.2d at 576.

Lasinski's report is properly presented on rebuttal because it responds directly to the points raised by Myers, such as whether the Profile Software may be subject to an open-source software license and whether FIS's definition of the Profile Software is reasonable from a licensing perspective.  This is evident from the fact that every sub-section of the "Analysis and Opinion" portion of the Lasinski report centers around a direct quote from Myers, with each section detailing Lasinski's response.  The Lasinski report will therefore not be excluded on this ground.

30

TNI next argues that the report should be excluded because it contains impermissible legal conclusions.  But rather than draw legal conclusions, Lasinski, like Myers, discusses the Agreements in the context of customary licensing practices.  To the extent Lasinski threatens to stray or strays into reaching legal conclusions at trial the parties are free to object or move to strike that testimony then.  *See Benjamin*, 820 F.2d at 643 n.5 (upholding motion to strike expert testimony made at trial).

Finally, TNI argues that Lasinski's methodology is inappropriate because his opinions are based on his "experience as a licensing expert" and what he would "expect to see" in practice.  But an expert is permitted to base his opinions on the customs and business practices in the industry in which he works.  *Berckeley*, 455 F.3d at 218 (noting that former SEC counsel's testimony on business practices would be helpful to the jury in providing context for the case).

### F.  The Walton Report

Jeffrey Walton, a technology professional in the banking and financial industry sector with over 20 years' experience in managing, programming, training and analyses in client and/or server applications, has provided three expert reports on behalf of FIS, all of which TNI seeks to exclude and/or to strike portions thereof.

Walton's assignment in his first report, which he labels his "Opening Expert Report," was to provide opinions on: (1) whether the TBS Software includes open source software; (2) whether copies of the Profile Software are present in the TBS Software; and, (3) and whether the TBS Software consists of improvements or enhancements relating to the Profile Software or whether it comprises standalone software that can be run independently of the Profile Software. He concludes, *inter alia*, that the TBS Software includes improvements relating to the Profile

Software and that these improvements are enhancements to the Profile Software. He further opines that the TBS Software is dependent on the Profile Software, that it cannot run independently of the Profile Software, and that it was not designed to run with any other software.

Walton next supplies an expert report in rebuttal to Intraha's expert report in which he was asked to consider whether he agrees with Intraha that the TBS Software is capable of running independently of the Profile Software. He concludes that the TBS Software cannot run independently of the Profile Software and opines that the TBS Software was not designed to run with any other core banking software. He goes further to state that to the extent that TNI customizes the TBS Software to work with other core banking software, the level of effort involved in planning, designing, drafting requirements, building, documenting, testing, deploying, and maintaining it to accomplish such customizations would be prohibitively expensive.

In his third report, which is labeled a Rebuttal to the Initial Expert Report of Monty Myers, Walton concludes that: (1) the Profile Software has not been open-sourced and remains a proprietary commercial software; (2) that two databases discussed by Myers in his report (the GT.M database and the YottaDB database) are, respectively, only a part of the Profile Software and not relevant to the discussion of the Profile Software; (3) that the function of sending a message or alert is and has long been a feature of the Profile Software; (4) that the Profile Infrastructure Project ("PIP") is a collection of utility tools (which do not include any banking functionality or banking specific schema) which are not a standalone product capable of running a production environment; and, (5) Submodule TN6.2 of the TBS Software constitutes

improvements or enhancements to the Profile Software and is, accordingly, dependent on the Profile Software.

As a preliminary matter, TNI argues that Walton's opinion in all of his reports with respect to whether the TBS Software is an improvement or enhancement to the Profile Software is in fact a legal conclusion concerning software ownership. TNI argues that this is so because the words "Derivate Works," "improvement" and "enhancement," all used in the report, are also all terms used in the Agreements. As discussed *supra*, while experts are prohibited from providing an opinion on an ultimate legal conclusion, *Berckeley*, 455 F.3d at 217, mere discussion of contractual terms in an expert report does not render the report inadmissible. *See, e.g., Roche*, 756 F. Supp.2d at 606. Here, Walton expressly states that he is not an expert in contract or copyright law and is not purporting to provide any opinions regarding the legal standards to be used in this case. That said, he explains that he was asked to provide an opinion in the "context of legal standards that have been explained to me by counsel for FIS."

A review of his reports shows that, although Walton uses the terms "improvements" and "enhancements," he is not providing a legal analysis of who owns the TBS Software under the Agreements—in other words, he is not opining on the legal effects of the Agreements. Rather, he provides a technical analysis of why he believes the TBS Software cannot operate independently of the Profile Software. For example, he explains that the TBS Software can only operate concurrently with the Profile Software because the TBS Software runs in the same runtime environment as the Profile Software. He also explains that the TBS Software modules are written in a specific language designed for use with the Profile Software. Based on this technical analysis, Walton concludes that the TBS Software modules are "improvements or

33

enhancements" to the Profile Software, in the technical sense of those terms.  Walton's opinions

therefore do not constitute the type of conclusory legal analysis prohibited by the rules.  *See, e.g.,*

*Takeda*, 2019 WL 9596536, at *1 n.1 (E.D. Pa. Sept. 4, 2019) ("although Cowhey references

legal documents, it does not appear that he is trying to 'explain the law' or render an opinion

about 'what the law requires'"); *Comcast*, 203 F. Supp.3d at 546 (admitting testimony because

"Lanning's testimony was based, in part, on the plain language of a contract provision and was

not offered to explain the legal effect of the agreement.").

TNI next challenges the reliability of Walton reports because, it argues:  (1) they are

based on a review of the wrong materials or purposefully ignore relevant materials; and, (2) they

fail to use a methodology sufficiently rigorous to withstand a *Daubert* analysis.

First, TNI argues that Walton's opinions should be excluded because he allegedly relied

on the wrong version of the TBS Software.  For background, TNI originally provided a

description of the TBS Software to FIS in an "Appendix A" to an interrogatory response, which

consisted of a 159-page list of file names.  At some point thereafter, TNI supplied FIS with an

amended "Appendix A" which deleted a handful of file names from the list.  According to TNI,

Walton's opening report relied on the original Appendix A, thus rendering the bases for his

opinions incorrect and "wholly irrelevant."  FIS responds that the minimal differences between

these two appendices do not warrant total exclusion of Walton's report.

"[A]s a general rule, questions relating to the bases and sources of an expert's opinion

affect the weight to be assigned that opinion rather than its admissibility and should be left for

the jury's consideration." *Tuman v. Genesis Assocs.*, 935 F. Supp. 1375, 1385 (E.D. Pa. 1996).

If TNI believes that the slight differences between Appendix A and the updated Appendix A

34

undermine Walton's opinions, it can ask questions about those differences at trial.  But as things stand, this is not a situation where the sources Walton relied upon were so incorrect as to render his opinions "fundamentally unsupported" in fact.  *Id*.  Walton's opinion will therefore not be excluded on this ground.

Similarly, TNI argues that Walton relied on the wrong version of the Profile Software in his opening report, as well as in his rebuttal to the Myers report.[13]  It is undisputed that Walton reviewed numerous versions of the Profile Software.  TNI, however, contends that Walton did not review the relevant version of the Profile Software, which, for purposes of the Software License Agreement, is the software that was "furnished to [TNI] by Sanchez" when the Profile Agreements were originally entered into.

TNI argues that this renders Walton's report (and rebuttal reports) unreliable.  In support of its argument, it cites to testimony from Walton's deposition, where he states that the point in time at which he received the proper version of the Profile Software "might have been" after FIS turned over to TNI his opening report.  Since that deposition, however, Walton has had an opportunity to review his correspondence, calendar, and other information which allowed him to state, in a declaration submitted under penalty of perjury, that he did in fact review the correct version of the Profile Software source code prior to issuance of his opening report on May 27, 2021.  Further, FIS argues that its expert must have reviewed the proper source code, because

---

[13] TNI does not dispute that Walton possessed the proper version of the Profile Software "for inclusion in the Walton Rebuttal Report to Myers."  However, it argues in passing that Walton's rebuttal report to Myers should be excluded because "[i]n discussing certain features of the Profile Software, Walton discussed the Profile Software version 7.5.2. GA," which it argues is the incorrect version of the program.  A review of the report shows that this version of the Profile Software was only discussed as an example illustrating the point that "FIS continuously improved the Profile Software to meet the end-customer needs and demands."  Walton does not state that he relied on the source code for version 7.5.2 GA of the Profile Software, and thus Plaintiff's argument on this point has no traction.

Walton would not have been able to generate certain attachments to his opening report otherwise.  The back and forth between the parties regarding whether Walton did in fact review the proper version of the Profile Software prior to submitting his initial report may be a subject for questioning at trial but not for exclusion of his report.

Finally, TNI claims that Walton did not consider "extensive technical evidence" regarding the TBS Software in the form of "over five thousand pages of technical specifications, software architecture documents, and software blueprints that TNI provided to FIS in this litigation."  TNI's criticism misses the point of the *Daubert* standard.  *Daubert* is meant to protect the jury from opinions by experts that are "connected to existing data only by the *ipse dixit* of the expert," *Kumho*, 526 U.S. at 157; it is not meant to test whether an expert's opinion is *correct*, but only whether it is *reliable*.  *See Paoli*, 35 F.3d at 744 ("[t]he evidentiary requirement of reliability is lower than the merits standard of correctness").  TNI does not contest that Walton reviewed source code, documents in the record, and deposition testimony; it argues only that Walton should have reviewed *more*, an issue better suited for cross-examination at trial.  *See Stecyk*, 295 F.3d at 414; *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997), as amended (Dec. 12, 1997) (credibility and weight of expert testimony decided by factfinder).

TNI also attacks Walton's methodology as unreliable.  First, TNI argues that in analyzing the TBS Software Modules TN1-4 and 7, "Walton only read the file names," and did not engage in a more rigorous review of the material.  As previously discussed, however, TNI never produced the source code for TN1-4 and TN7 in this litigation in contravention of court order.  Consequently, according to Walton's report, his opinions on these modules are "formed largely based on the type, name, description, and business function" of the TBS Software file names

36

(which TNI provided in its interrogatory responses), "as well as on other record evidence in this case, such as technical specifications, deposition transcripts, and email correspondence."  TNI is in no position to fault Walton for not further analyzing source code that it contends it owns but chose not to produce (and therefore chose not to make available for inspection).

Further, Walton did more than just "read file names."  He analyzed the technical specifications for the pertinent programs, the architecture of the Profile Software and the TBS Software, the source code for the Profile Software, and drew on his extensive experience with the Profile Software to discuss why he believes certain modules of the TBS Software cannot run independently of it.  Moreover, FIS argues that the "z-prefixed" file names in the TBS Software are significant because they follow FIS's naming convention for identifying source code originally developed as part of the Profile Software.  In other words, Walton believes that file names with a "z" prefix indicate that a file is an improvement to the Profile Software.  Thus, Walton's comparison of file names could be helpful to a jury, and will not be excluded.[14]

Second, TNI argues that Walton does nothing more in his reports than parrot deposition testimony.  It asserts that in certain cases, "Walton's entire basis for concluding that a particular [TBS Software] module is an enhancement is only repeated deposition testimony."  As a preliminary matter, TNI isolates the paragraphs cited, separating them from their context.  For example, paragraph 192 states that one "additional reason" for believing that TBS Software module 5.1 is an improvement to the Profile Software is that one of TNI's own employees testified as such.  Immediately prior to that paragraph, however, Walton engages in a technical

_____

[14] TNI makes a similar argument in passing regarding Walton's rebuttal report, stating that "Walton did nothing more than read the list of directories on the[] disks" containing the Profile Software source code.  This argument lacks merit for the same reasons discussed above.

analysis, explaining that certain TBS Software modules "contain explanations and annotations that establish [that] the Profile Software must be configured before launching of these tools," providing examples.  Contrary to TNI's assertions, therefore, Walton's report engages in a meaningful technical analysis, and will not be excluded on this ground.

Finally, TNI challenges the fit of the Walton reports.  TNI argues that Walton's opinions concerning the TBS Software's capabilities are irrelevant, because he only analyzes whether the TBS Software is *currently* capable of running independently of the Profile Software, as opposed to whether the TBS Software may be able to run independently of the Profile Software in the future.

Underlying TNI's argument is a debate over the meaning of the term "capable" in the SLA.  As previously discussed, ownership of the TBS Software depends in part on whether it is "capable of running independently of the Licensed Software."  TNI relies on a definition of "capable" found in the Myers report, which describes the term as "the ability to operate in a certain way, not the requirement that it actually operate in that certain way."  FIS opts for a different definition of "capable," based on a technology's present abilities.

Regardless of which definition is correct, Walton's opinions are relevant.  "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Moreover, "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility if it has the potential for assisting the trier of fact."  *Oddi*, 234 F.3d at 146.

As a reminder, Walton opines that, as a technical matter, the TBS Software cannot currently run independently of the Profile Software.  Whether something is currently capable of

running independently of the Profile Software is certainly relevant to whether it may "have the ability to" run independently of the Profile Software in the future.  Therefore, even if one were to adopt TNI's forward-looking definition of "capable," Walton's opinion remains relevant because it makes it less likely (or, if disbelieved, more likely) that the TBS Software is "capable" of running independently of the Profile Software one day.  Walton's opinions therefore fit the case. *Id*.

TNI also argues that Walton's rebuttal to Intraha's report is irrelevant, because it allegedly only re-hashes the opinions in his opening report.  TNI's argument is easily dismissed. The Intraha report opines that the TBS Software is capable of running independently of the Profile Software; Walton's rebuttal report opines that it is not. Walton's report therefore squarely rebuts Intraha's.[15]  For the reasons discussed above, TNI's motions to exclude all of the Walton reports will be denied.[16]

## IV.   CONCLUSION

For the foregoing reasons, TNI's Motion to Strike the Ratanachueskul report and FIS's Motions to Exclude the Intraha report and the Intraha declaration will be granted.  TNI's Motion to Exclude the Riley report, Motion to Strike the Lasinski report, and Motion to Strike the

---

[15] TNI also argues that paragraph 46 of Walton's rebuttal report "includes irrelevant and inflammatory statements regarding TNI's alleged activities that merely parrot Defendants' conspiracy theory arguments, and where Walton has no first-hand knowledge or basis."  That paragraph is merely a recitation by Walton of his understanding of the Complaint, does not contain any of his opinions and its inclusion is not, accordingly, a basis to exclude his report.

[16] TNI argues in passing that Walton "does not have the requisite expertise to present an expert opinion with respect to the PIP Software" in particular.  TNI does not otherwise contend that Walton is not generally qualified to be an expert in this case, however, and cites to no legal authority for the proposition that an expert must have extensive experience with each item of evidence over which he opines.  To the contrary, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."  *Pineda*, 520 F.3d at 244 (3d Cir. 2008).

Walton report will be denied.  FIS's  Motion to Exclude the Myers report is granted only to the extent that it seeks to exclude Myers' opinions concerning the admissibility of the Walton report.

 An appropriate order follows.

     **BY THE COURT:**


      **/s/Wendy Beetlestone, J.**


     _____

     **WENDY BEETLESTONE, J.**