## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| T.N.  INCORPORATION, LTD, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO.  18-5552 |
| | : | |
| FIDELITY NATIONAL | : | |
| INFORMATION SERVICES, INC., | : | |
| FIDELITY NATIONAL | : | |
| INFORMATION SERVICES, | : | |
| (NETHERLANDS) B.V., FIDELITY | : | |
| INFORMATION SERVICES | : | |
| (THAILAND) LTD., AND FIDELITY | : | |
| INFORMATION SERVICES, LLC, | : | |
| Defendants. | : | |

## OPINION

This dispute arises out of a set of licensing and distribution agreements between Plaintiff

T.N. Incorporation Ltd. ("TNI") on the one hand and Defendants Fidelity Information Services,

LLC, Fidelity Information Services (Netherlands) B.V., and Fidelity Information Services

(Thailand) Ltd. (collectively, "FIS"), on the other, regarding the implementation and distribution

of a core banking software ("the Profile Software")—a program that integrates all transactions,

accounts, customers, reports, and other functions that a bank performs—to banks in Thailand.

The business relationship lasted for years before escalating into a bitter fight which is now before

the Court.

At the parties' request, the proceedings were bifurcated into two phases.  The parties have

filed partial motions for summary judgment on some of the Phase 1 claims and counterclaims.

1

The paramount question dividing them now is who owns the Profile Software and who owns software TNI has dubbed "TNI Business Solutions."

## I.     BACKGROUND

The story here begins in 2001 when Sanchez Computer Associates ("Sanchez"), a software company, sought out a partner to assist it in implementing and distributing its Profile Software in Thailand.  Sanchez found that partner in TNI.  To set the terms of their relationship, the parties entered into a Master Agreement for Consulting Services ("MACS"), a Systems Integration and Distribution Agreement ("SIDA"), and a Software License Agreement ("SLA") (collectively, "the Agreements") each of which is at issue here.[1]

Under the MACS, the parties agreed to terms under which they would provide support and consulting services to one another.  Under the SIDA, Sanchez gave TNI a right to distribute the Profile Software; in return, TNI promised, *inter alia*, to use its "best efforts to promote the overall reputation and good will of Sanchez" and "not [to] directly or indirectly represent, market, develop, or invest in any products or entities which are in direct competition with the Sanchez Products."  Under the SLA, Sanchez granted TNI the right to sublicense the Profile Software to Thai banks.  Importantly, the SLA outlined what software each party would own and would not own during the term of the agreement and thereafter.  According to the SLA, Sanchez would own all "improvements" or "enhancements," to the Profile Software, including "Derivative Works."  TNI would own "Other Software."  Because TNI's work would involve

---

[1] Sanchez originally partnered with TNI's predecessor, T.N. Information Systems Ltd.  The parties agree that the SIDA and the SLA were assigned to a wholly-owned subsidiary T.N. FI Solutions Ltd (now doing business as T.N. Incorporation Ltd.) in 2012.  It is not clear from the record when the MACS was assigned to TNI.

handling sensitive Sanchez information, TNI also promised in each of the Agreements not to disclose any confidential information to third parties, except in certain limited circumstances. TNI began its work under the Agreements, which, in its view, required it to develop what it refers to in this litigation as "TNI Business Solutions" (the "TBS Software"), a software that aligns the Profile Software with Thai banking laws and regulations.

In 2004, FIS, a global banking software provider and the Defendant here, acquired Sanchez; its affiliates therefore became successors to the Agreements. According to TNI, over the years, the "level of [technical] support provided by FIS decreased substantially." When TNI expressed concern about this lack of support, FIS allegedly responded with empty promises of future software enhancements that were never fulfilled. In TNI's view, FIS's "role at this stage was solely to collect fees for TNI's work." For that reason, TNI claims it was blindsided when FIS suddenly terminated the Agreements. Upon request, TNI returned the original source code for the Profile Software sent by FIS years before. But it refused to return the source code underlying the TBS Software—which it now describes as a "collection of services and software TNI offers to its customers"—claiming it was "Other Software" under the terms of the SLA.

From FIS's standpoint, TNI has the story all wrong. FIS never "terminated" the Agreements; they were simply not renewed. FIS did not abandon TNI all those years; it provided TNI with ongoing support through updates, enhancements, technical advice, and training. TNI did not wholly develop the TBS Software; it was a joint effort between TNI and FIS. And, finally, FIS owns the TBS Software because, under the SLA, it is an "improvement" or "enhancement," including a "Derivative Work," of the Profile Software.

And so the skirmishes began. FIS sent letters to TNI's bank clients, informing them that

3

it owned "any/all the intellectual property rights in and to any customizations, enhancements, modifications, that may have been made to the [Profile] Software." TNI then filed this lawsuit and FIS, in turn, filed its Counterclaims.

As discovery commenced, the bickering intensified. The parties engaged in a months-long dispute regarding production of source code modules that underly the TBS Software: TN1, TN2, TN3, TN4, TN5, TN6, and TN7. Eventually, TNI produced TN5 and TN6 to FIS, but refused to provide the remaining modules to FIS's technical experts for inspection. After a conference call with the Court during which TNI confirmed that it was refusing to produce the remaining modules, the Court granted FIS's Motion to Preclude Unproduced Source Code, and barred the use of TN1-TN4 and TN7 by TNI "at trial or for any other purpose" as a sanction for TNI's failure to turn over the source code modules.

Similarly, TNI declined to produce documents about its involvement with two software start-ups, Finxact and YottaDB, until ordered to do so by the Court. According to FIS, upon receipt and review of the Finxact and YottaDB documents, it discovered that TNI had worked extensively with these startups to develop and promote banking software and services that compete with FIS's Profile Software. Accordingly, FIS now contends that TNI engaged in a scheme to develop competing software with the likes of Frank Sanchez (founder of Finxact and Sanchez, TNI's former partner) and YottaDB (founded by a former employee of FIS). In particular, FIS claims that TNI: invested in and "formed alliances with" these startups; solicited FIS's employees to work for these startups; spread false information (or, as FIS put it, "bad-mouth[ed]") FIS to customers or potential customers; disclosed to these companies FIS's confidential information; used FIS's confidential information while providing maintenance

4

services to banks; and refused to participate in bids with FIS for banks' business, instead diverting business to itself and these entities.  In FIS's words, discovery led to revelations about TNI's "disloyalty," "dishonesty," and "misdeeds."

TNI, in turn, denies these allegations, and asserts that FIS's theories about TNI developing a competing software merely "stem from a rumor that FIS employees heard from an unidentified third party, somewhere in Asia."  It also argues that FIS should not even be allowed to proceed on these theories of supposed disloyalty because FIS never pled them in its Counterclaims.  In exhausted tones, TNI characterizes FIS's theories in its papers as "typical" of its "relentless overreaching."

Before the Court now are the parties' motions for partial summary judgment, which are filled with numerous accusations of wrongdoing for a myriad of different events.  The Court's role at this juncture, however, is not to resolve every little tiff between the parties, but to determine whether either party is entitled to judgment as a matter of law in this phase of the litigation.

## II.    STANDARD OF REVIEW

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotations omitted); Fed. R. Civ. P. 56.  A fact is material where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  And, a genuine issue is present "when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch*., 480 F.3d

252, 256 (3d Cir. 2007).  The moving party bears the burden of showing the absence of a

genuine issue as to any material fact.  *Adickes v. S.H.  Kress & Co*., 398 U.S. 144, 157 (1970).

The non-moving party "may not merely deny the allegations in the moving party's pleadings;

instead, he must show where in the record there exists a genuine dispute over a material fact."

*Abington Friends Sch*., 480 F.3d at 256.  In ruling on a summary judgment motion, a court must

"view the facts and draw reasonable inferences in the light most favorable to the party opposing

the summary judgment."  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and

alterations omitted).

## III.        FIS'S MOTION FOR SUMMARY JUDGMENT

FIS seeks summary judgment: (1) in favor of its Counterclaim for a declaratory judgment

that it owns "the Profile Software and Any Part of the TNI Business Solutions Derivative

Thereof"; (2) against TNI's claim requesting a declaratory judgment that TNI owns the TBS

Software; and, (3) against TNI's claim that FIS breached the SLA by sending letters to TNI's

bank clients regarding ownership of the contested software.  Resolution of these claims rest on

the interpretation of several inter-related contractual terms.

In a contract interpretation action, summary judgment is appropriate only where the

contractual language is unambiguous—*i.e.*, "subject to only one reasonable interpretation."

*Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co*., 180 F.3d 518, 521 (3d Cir. 1999) (citations

omitted).  "If the nonmoving party presents a reasonable alternative reading of the contract, then

a question of fact as to the meaning of the contract exists which can only be resolved at trial."

*Newport Assocs. Dev. Co. v. Travelers Indem. Co*., 162 F.3d 789, 792 (3d Cir. 1998).

6

### A.  Principles of Contract Interpretation

The end goal of contract interpretation is to determine "the intent of the parties at the time they contracted." *Motor Coils Mfg. Co. v. Am. Ins. Co.*, 454 A.2d 1044, 1047 (Pa. Super. 1982) (quoting *Spatz v. Nascone*, 424 A.2d 929, 937 (Pa. Super. 1981)).  The parties' intent is determined from their objective manifestations, rather than their subjective, silent intent. *Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 483 (Pa. Super. 1984).

Under Pennsylvania law, if a contract term is unambiguous, it is "interpreted by the court as a matter of law." *Allegheny Int'l v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994).  On the other hand, if a term is ambiguous, "deciding the intent of the parties becomes a question of fact for a jury." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009).  Thus, as a preliminary matter, the Court must determine whether the terms of the contract are ambiguous or unambiguous.  *Id*.  Terms are ambiguous if they are "reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)).  "The words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning" may all be considered in making this determination.  *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001); *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980).

Terms that are unambiguous are applied according to their plain meaning.  *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982).  And, "when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement," without resort to

7

extrinsic or parol evidence. *Id*. Courts limit themselves to the words in a contract in order to prevent re-writing the agreements of private parties. *Id*. at 662.

Several consequences flow from the rule barring consideration of extrinsic evidence. For example, because the parties' intent is deemed manifested as expressed in the agreement, it is not assumed that the parties chose contractual language carelessly. *Id*. (citing *Moore v. Stevens Coal Co*., 173 A. 661, 662 (Pa. 1934)). Thus, terms will not be construed in such a manner so as to render them meaningless. *USX Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 200 (3d Cir. 2006). Similarly, contract terms will not be interpreted in a manner that results in annulment of another term. *Porter v. Chevron Appalachia, LLC*, 204 A.3d 411, 418 (Pa. Super. 2019). Rather, contracts are to be read as a whole to give effect to all of their provisions. *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001).

There are exceptions to the rule barring consideration of extrinsic evidence, but they remain few. In rare cases, such evidence can be used to show a latent ambiguity, *i.e.*, "an ambiguity that arises from extraneous or collateral facts that make the meaning of a written agreement uncertain while the language thereof, on its face, appears clear and unambiguous." *Steuart*, 444 A.2d at 663. However, such evidence cannot be considered if it merely concerns "a party's beliefs about the general ramifications of the contract" or the parties' expectations. *Bohler-Uddeholm Am., Inc*., 247 F.3d at 94.

In this case, the parties articulate very different understandings of what certain terms in the SLA mean, which shall be more fully explored below. Importantly, however, terms are not rendered ambiguous merely because the parties squabble over their meaning. *Bohler-Uddeholm Am., Inc.,* 247 F.3d at 94-95 ("[M]ere disagreement between the parties over the meaning of a

8

term is insufficient to establish that term as ambiguous."); *Mellon Bank*, 619 F.2d 1001 at 1013.

Rather, to demonstrate an ambiguity, "each party's proffered interpretation must be reasonable,

in that there must be evidence in the contract to support the interpretation beyond the party's

mere claim of ambiguity; and [] the proffered interpretation cannot contradict the common

understanding of the disputed term or phrase when there is another term that the parties could

easily have used to convey this contradictory meaning." *Bohler-Uddeholm Am., Inc.,* 247 F.3d at

94-95.

### B.  Interpretation of Terms

Several key terms of the SLA must be examined to assess the parties' divergent claims of

ownership over the TBS Software.[2]

The first set of terms are "Licensed Software" and "Derivative Works."  According to the

SLA, FIS owns "Licensed Software," as well as all "inventions, discoveries, improvements, or

---

[2] The parties dispute whether the MACS is also relevant to TNI's claim of ownership over the TBS Software.  The MACS sets forth the terms under which TNI and FIS "may provide consulting services as a subcontractor to the other party."  It also provides that TNI or FIS can provide services to a customer "by contracting independently with a customer, unless mutually otherwise agreed in writing."  Section 1.3 explains that services to be performed under the MACS are to be described in a "Statement of Work" ("SOW").  The MACS provides that TNI would own work it makes "during the course of performing work that incorporate or modify existing TNI[]-owned technology" under the agreement, *i.e.*, pursuant to a SOW.  But TNI never claims—nor identifies an SOW suggesting—that it made the TBS Software "during the course of performing work" under the MACS; this agreement is therefore not applicable to either declaratory judgment claim.

TNI makes a strained argument that because the MACS provides that TNI or FIS can provide consulting services to customers (in addition to each other), and TNI provided the TBS Software to its bank customers, TNI owns the TBS Software.  But Section 1.0 of the MACS makes clear that all it does is permit either FIS or TNI to provide consulting services to customers under the terms of separate, independent agreements that have nothing to do with who owns the TBS Software.  TNI further argues that because the MACS provides that TNI would own work "that incorporates or modifies [TNI's] own existing technology," and it "has identified its extensive pre-existing technology," it owns the TBS Software.  But the "pre-existing technology" TNI has "identified" by citing to its Counterstatement of Material facts is a core banking system it supplied to Bangkok Bank in the 1990s, which neither party pretends has any relevance to the TBS Software.  Consequently, the MACS does not bear on the question of who owns the TBS Software.

enhancements relating to the Licensed Software, including without limitation, all Standard Enhancements, Optional Enhancements and Derivative Works."  The term "Derivative Works" is in turn defined as "any source code development, including all documentation relating thereto, which incorporates or modifies any source code delivered by [FIS] as part of the Licensed Software or which relies on any [FIS] trade secrets which are discerned directly from such source code."

    The second key term to be interpreted is "Other Software"—defined in the SLA as "any application software that (a) Licensee or End User has acquired at their expense, (b) is capable of running independently of the Licensed Software, and (c) does not include any portion of the Licensed Software"—which, per the terms of the SLA, FIS does not own.

    As a threshold matter, TNI asserts that FIS's Motion for Summary Judgment cannot be granted on either its claim or FIS's Counterclaim for a declaratory judgment regarding software ownership because certain terms contained in the SLA are ambiguous.  In discussing various terms and their meanings, it divides its arguments for ambiguity into three conceptual categories: contractual terms defined in the SLA ("Licensed Software"; "Other Software"; "Derivative Works"); terms which are used in but not defined by the Agreement ("improvements" and "enhancements"); and one term used by FIS in its Motion but not mentioned in the Agreements at all ("Profile Customizations").

    Undefined words in a contract are to be given their ordinary meaning.  *Lenau v. Co-eXprise, Inc*., 102 A.3d 423, 429 (Pa. Super. 2014) (quoting *Kripp v. Kripp*, 849 A.2d 1159, 1163 (2004)); *True R.R. Assocs., L.P. v. Ames True Temper, Inc*., 152 A.3d 324, 339 (Pa. Super. 2016) (a court "may inform [its] understanding of [contractual] terms by considering their

dictionary definitions.")  But when terms in a contract are defined, such as here "Licensed Software," "Other Software," and "Derivative Works," the dictionary definition of a word must give way to its designated denotation in the contract.  *Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Prop. & Cas. Ins. Agency*, 693 A.2d 1330, 1340 (Pa. Super. 1997).

### i.   *Terms Already Defined in the SLA*

#### a.   "Licensed Software"

"Licensed Software" is defined in the SLA as "the [FIS] proprietary computer software identified in the Preamble, together with related Documentation and including, at any given time, all previously released Standard Enhancements and any Optional Enhancements furnished to Licensee by [FIS]."  Although the parties do enter into a dispute as to the meaning of the word "enhancement"—an undefined term in the SLA when written with a lower case "e," which dispute will be discussed later—they do not argue over the meaning of the terms "Documentation,"[3] "Standard Enhancement,"[4] or "Optional Enhancements."[5]

Unfortunately, although the word "Preamble" is capitalized and, thus, pursuant to contract drafting convention, should be defined somewhere in the agreement, it is not.  Indeed, nowhere in the SLA is there a provision labeled "Preamble."  In the absence of a Preamble, the

---

[3] Section 2.4 defines "Documentation" as "available functional specifications, release notes, reference manuals, user guides, system operation guides and other materials, in the format (whether in written or machine readable form, including materials on Compact Disk (CD)) as supplied by [FIS] to Licensee."

[4] Section 2.15 defines "Standard Enhancements" as "those improvements, additions and revisions to the Licensed Software and/or Documentation that are part of the scheduled software development plan of [FIS] and are furnished to PROFILE Licensees who have software support agreements in force for no additional fee."

[5] Section 2.8 defines "Optional Enhancements" as "any improvements, additions and revisions to the Licensed Software and/or Documentation that are developed by [FIS], are not within the scheduled software development plan of [FIS] and are offered to Licensee for an additional fee."

parties both look for the meaning of "Licensed Software" in the provision of the SLA entitled "Introduction." The Introduction provides in relevant part that: "Licensee wishes to license from [FIS] and [FIS] wishes to license to Licensee an integrated software system (the 'System') consisting of certain software that is proprietary to [FIS] as follows: PROFILE®/Anyware and the M database software and any other components."

Putting these pieces together, "Licensed Software" is unambiguous, and is "the "PROFILE® /Anyware and the M database software and any other components," plus any related "Documentation" as well as "Standard Enhancements" and "Optional Enhancements" provided by FIS.

TNI's arguments to the contrary are not well put. It first argues that use of the phrases "certain software" and "any other components" in the Introduction are not defined in the SLA, and are, accordingly, ambiguous. But a conclusion that a term is not defined does not necessarily lead to a conclusion that it is ambiguous. Rather, a term is ambiguous only if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *In re Old Summit Mfg.*, 523 F.3d at 137 (3d Cir. 2008) (quoting *Hutchison*, 519 A.2d at 390). "The 'reasonably' qualifier is important; there is no ambiguity if one of the two proffered meanings is unreasonable." *Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009); *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 96. TNI's argument that the Introduction includes "vague, self-referential, open-ended, and circular language," is not supported by any viable explanation as to why it believes that to be the case and is, thus, unreasonable.

TNI's next argument for ambiguity is equally unavailing. By reference to: (1) the deposition testimony of Frank Sanchez, founder of Sanchez Computer Associates and Finxact,

and one of the negotiators of the Agreements; and, (2) a declaration TNI attached to its Motion for Summary Judgment by its Chief Executive Officer, Vigrom Chaisinthop, who was a signatory to the Agreements, it introduces the concept of "core" Profile Software or "standard" Profile Software.  Specifically, TNI argues that "the intention of the parties to the Profile Agreements was that TNI was to own software it independently created outside the core."

But both Frank Sanchez's deposition testimony and Chaisinthop's declaration add concepts—"core" and "standard"—not found in the definition of "Licensed Software" as informed by the Introduction.  Before analyzing extrinsic evidence, a court must "consider whether the extrinsic evidence that [TNI] seeks to offer is the type of evidence that could support a reasonable alternative interpretation of the contract." *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 93.  In *Bohler*, the Third Circuit explained that proper extrinsic evidence "must show that some specific term or terms in the contract are ambiguous; [the evidence] cannot simply show that the parties intended something different that was not incorporated into the contract." *Id*.  *Bohler* also clearly stated that extrinsic evidence about "the parties' expectations" or "a party's beliefs about the general ramifications of the contract" cannot establish a latent ambiguity.  *Id*.

In his deposition testimony, Mr. Sanchez stated that it was the intent of the drafting parties to have Sanchez Computer Associates retain ownership of what he called Profile Software "core," while TNI would own "modifications" it created "outside of the core."  His testimony is therefore only about "the parties' expectations." *Id; see, e.g., ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C.*, 2014 WL 1515709, at *9 (M.D. Pa. Apr. 15, 2014) (finding that evidence about the party's "general belief" regarding what the contract provides "is not the 'right type' of extrinsic evidence under Pennsylvania law" to create a latent ambiguity).

13

Chaisinthop attested that "TNI generally considers the 'Licensed Software' to be the standard Profile Software that acts as the core banking engine which was delivered to TNI by Sanchez pursuant to the Profile Agreements."  The insertion into the clear definition of "Licensed Software" two words that are not there—"standard" and "core"—simply show that one of the parties may have intended something different that was not incorporated into the definition.  *Bohler*, 247 F.3d at 93.  But given the unambiguous definition of "Licensed Software," it is inappropriate to incorporate these concepts into the definition.  In essence, although the parties may be in "disagreement" over the meaning of "Licensed Software," that disagreement in and of itself is "insufficient to establish that term as ambiguous."  *Id.* at 94.

The meaning of "Licensed Software" is critical in that it informs the definitions of "Other Software" and "Derivative Work."  In short, TNI asserts that it owns the TBS Software if it is considered "Other Software" under the SLA, while FIS asserts that it owns the software if it is considered an "improvement" or "enhancement," including a "Derivative Work," of the Profile Software.

### b.  <u>"Other Software"</u>

Section 4.2 of the SLA provides that "the terms and conditions of this Agreement are not intended to apply to Other Software nor does [FIS] assert any ownership in or responsibility for any Other Software."  The parties agree that "Other Software" is defined by the SLA as software that "(a) [TNI] has acquired at their expense, (b) is capable of running independently of the Licensed Software, and (c) does not include any portion of the Licensed Software."  The parties do not, however, agree as to the meaning of the words "acquired," "capable of running independently," and "portion."

14

1.   *"Acquired at their expense"*

With respect to the word "acquired," FIS argues that the TBS Software is not "Other Software" because TNI did not "acquire" the TBS Software "at [its] expense."  In support of this position, it cites to the deposition testimony of Chaisinthop, who confirmed that TNI did not "acquire [the TBS Software] from somewhere else," but rather "built and developed [it]."  In making its argument, FIS assumes that the word "acquire" does not encompass TNI's efforts to build and develop the TNI Software.

FIS's understanding of "acquire" is too narrow.  As a preliminary matter, it should be reiterated that undefined terms in a contract "are to be given their ordinary meaning."  *Lenau*, 102 A.3d at 429 (quoting *Kripp*, 849 A.2d at 1163).  In ascertaining the "ordinary meaning" of a term, courts may look to the dictionary definition of the words found in the term.  *True R.R. Assocs.*, 152 A.3d at 339.  Given that the SLA does not define "acquire," FIS's assumption is tested by reference to the dictionary definition of "acquired," which is "gained by or as a result of effort or experience."  *Acquired*, Merriam-Webster, https://www.merriam-webster.com/ dictionary/acquired (last visited Mar. 16, 2022); *Acquire*, Collins, https://www.collins dictionary.com/us/dictionary/english/acquire (last visited Mar. 16, 2022) ("to get or gain by one's own efforts or actions"; "to come to have as one's own; get possession of"); *Acquire*, Oxford English Dictionary, https://www.oed.com/view/Entry/1731?rskey=4LD8RV&result =2&isAdvanced=false#eid (last visited Mar. 16, 2022) ("[t]o gain possession of through skill or effort; to obtain, develop, or secure in a careful, concerted, often gradual manner.")

The parties do not dispute that the SLA was amended by the parties 29 times.  If FIS intended to express a concept with a narrower definition than that of the plain meaning of

"acquire," it could have negotiated—either in the original agreement or in its many amendments—for the use of a different word or phrase. It did not; therefore, the plain meaning prevails. *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 94-95.

> 2. *"Capable of running independently of the Licensed Software"*

FIS's argument that the TBS Software does not fall within the definition of "Other Software" because it is not "capable of running independently of the Profile Software," fares better. The parties go back and forth on this issue. FIS's expert, Jeffrey Walton, opines at great length that the TBS Software is not so capable because it never has run, and is not currently running, independently of the Profile Software. TNI counters that this is nonsense, because the TBS Software, in its view, *could be configured* to run independently of the Profile Software. According to TNI, so long as the TBS Software has "the ability of being adapted" to work with another core banking software, it is "capable of running independently" of the Profile Software. FIS responds that TNI's interpretation cannot possibly be correct because, if it were, "any software that could possibly, even hypothetically, be adapted to work with other core banking systems" would fall within the definition of Other Software.

As already discussed, the parties' dispute over the meaning of a term does not necessarily render it ambiguous: if there is a dispute one turns to dictionary definitions for guidance. But here, dictionary definitions are not helpful. Merriam-Webster highlights the breadth of the word's usage in defining "capable" as "having traits conducive to or features permitting something." *Capable*, Merriam-Webster, https://www.merriam-webster.com /dictionary/capable. (last visited Mar. 16, 2022). And other dictionaries confirm that a world of

meaning falls under "capable's" capacious umbrella.  Collins Dictionary defines the word as "having ability; able to do things well; skilled; competent."  *Capable*, Collins, https://www.collinsdictionary.com/us/dictionary/english/capable.  Oxford Dictionary defines the word as "[a]ble to take in, receive, contain, or hold; having room or capacity for."  *Capable*, Oxford English Dictionary, https://www.oed.com/view/Entry/27354?redirectedFrom =capable#eid (last visited Mar. 16, 2022).  These definitions provide no direction one way or another as to the meaning of the phrase "capable of running independently," as used in the SLA.  The conclusion follows ineluctably that, in the context of the SLA's language, and the parties' divergent viewpoints, the meaning of "capable" is ambiguous; that is, susceptible to more than one meaning.  Accordingly, it is for the jury to decide what "capable of running independently" means.  *Am. Eagle Outfitters,* 584 F.3d at 587.

   3. *"Does not include any portion of the Licensed Software"*

   The third characteristic of "Other Software" is that it "does not include any *portion* of the Licensed Software." (emphasis added).  The parties, as is their wont, argue fiercely over what this phrase means.  TNI notes that the word "portion" is undefined in the agreement and submits that it must be read to refer to a "material part" of the Profile Software source code.  But, once again, a trip to the dictionary is warranted, and that visit reveals that the common usage of the word "portion" does not support TNI's interpretation.  Dictionaries define "portion" severally as "an often limited part of a whole," *Portion*, Merriam-Webster, https://www.merriam-webster.com/dictionary/portion (last visited Mar. 16, 2022); "[a] part of any whole; a section, a division; a proportion, a fraction,*" Portion***, Oxford English Dictionary, https://www.oed.com/ view/Entry/148189?rskey=4X3WNN&result=1#eid (last visited Mar. 16, 2022); and, "a part of

any whole, either separate from or integrated with it," *Portion*, Collins, https://www.

collinsdictionary.com/us/dictionary/english/portion (last visited Mar. 16, 2022).  TNI cannot, in

hindsight, re-write the SLA to change the meaning of portion—from "a part" to "a material

part,"—in an attempt to render it ambiguous.  The parties used the term "portion" in the SLA

even though they could easily have used "material portion" instead; the latter interpretation

cannot be wielded to "contradict the common understanding of the disputed term."  *Bohler-*

*Uddeholm Am., Inc.*, 247 F.3d at 94-95.

c.  <u>"Derivative Work"</u>

TNI's arguments that the term "Derivative Work" is ambiguous is also ineffective.  The

SLA defines "Derivative Work" as a type of "improvement" or "enhancement"; specifically,

"any source code development, including all documentation relating thereto, which incorporates

or modifies any source code delivered by [FIS] as part of the Licensed Software or which relies

on any [FIS] trade secrets which are discerned directly from such source code."[6]  TNI points out

that the words "source code development," "incorporates," "modifies," and "discern" are all

undefined and concludes from this—without any suggestion that these words should be

interpreted in any way but their plain meaning—that the term "Derivative Work" must be

ambiguous.  But again, the fact that words in a contract are undefined does not make them

ambiguous—rather, words must be susceptible to more than one meaning to be so.  Absent

provision of an argument that the words are susceptible to a particular meaning and there being

---

[6] TNI first argues that this term should be read in the context of the definition for "Derivative Works" in the Copyright Act.  But there is no reason to look at the text of a statute for a term already defined in an agreement, *Volunteer Firemen's Ins. Servs.,* 693 A.2d at 1340, particularly where, as here, the contractual provision in which the term is found contains no suggestion that its interpretation should be informed by the Copyright Act.

nothing in the definition to suggest that they should be interpreted other than by their ordinary English usage, TNI's arguments fail in their efforts to inject any ambiguity into the defined term "Derivative Work."

### ii.   *Terms not defined in the SLA*

The parties go back and forth on whether two other words—found in the SLA but not defined by it—are ambiguous or unambiguous.  Those words are "improvement" and "enhancement."  Section 4.1 of the SLA provides as follows:

> Sanchez shall be the sole owner of all inventions, discoveries, **improvements**, or **enhancements** relating to the Licensed Software, including without limitation, all Standard Enhancements, Optional Enhancements and Derivative Works, whether in written or unwritten form, and of all methodologies, techniques and know-how resulting from the use of the Licensed Software and Sanchez shall retain the exclusive right to reproduce, publish, patent, copyright, sell, license, transfer and otherwise make use of the Licensed Software and all such inventions, discoveries, **improvements**, **enhancements** and methodologies, without accounting or attribution to Licensee or End User.  (Emphasis added).

### a.   "Improvement"

TNI's only arguments for its assertion that the term "improvement" is ambiguous are that it is undefined, and that "each of the parties struggles to define the term in their depositions."  In response, FIS asserts that "improvement" is not in fact ambiguous, and notes that courts across the country have interpreted the word broadly.

Turning once again to dictionaries, "improvement" is defined severally as "betterment" which is, in essence, the meaning that courts have ascribed to it.  *Improvement,* Collins, https://www.collinsdictionary.com/us/dictionary/english/improvement (last visited Mar. 16, 2022) ; Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/improvement ("the state of being improved"); *see Megdal Assocs., LLC v. La-Z-Boy Inc*., 2016

19

WL 4503340 at *3 (S.D. Fla. Feb. 19, 2016) ("An 'improvement' is generally defined as a 'change or addition that improves,' and to improve means to 'advance to a better state' or 'make better.'"); *Verizon Bus. Network Servs. v. Combs*, 2013 WL 1343530, at *8 (Tex. App. Apr. 3, 2013) (the ordinary meaning of "improvement" in a software contract is to make it "better").

TNI cites the deposition testimony of FIS's expert, Jeffrey Walton; FIS's 30(b)(6) witness, Matthew Lessig; and one of TNI's 30(b)(6) witnesses, Rachod Intraha, for its position that "improvement" is ambiguous. Extrinsic evidence such as deposition testimony, however, can only be considered when it provides a "reasonable alternative semantic reference" to certain terms. *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 94 n.3. The testimony cited by TNI does not so suggest. Walton testified that he did not provide a definition to the word "improvement" in his report, and that his understanding of the phrase is "something that makes [something else] better," which is consistent with the word's plain meaning. Lessig only provided an example about software to discuss what he thought an improvement would be, but did not provide thoughts on what he believed the word "improvement" itself means. And Intraha did not provide a definition of "improvement," stating that he considered a certain TBS Software module to be an "add-on" instead; but acknowledged that there might have been a problem with translating the word "improvement" into his native language, Thai.

Outside of its citation to impermissible extrinsic evidence, TNI does not advance any reason as to why "improvement" is ambiguous. Nor does it provide a reasonable alternative meaning for the term. *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 94. In this context, the word "improvement" is unambiguous and means "betterment," or "the state of being improved."

b.  "Enhancement"

TNI also asserts that the term "enhancement" is ambiguous, because there is "no accepted meaning [of the term] in the relevant industry," but provides no salient reason for and cites to no case law in support of the proposition that lack of an accepted term in an industry is indicative of ambiguity.[7]  The next step, therefore, is to turn the dictionary; but in this instance, the process yields minimal help.  The dictionary definition of "enhancement" is "the improvement of [something] in relation to its value, quality, or attractiveness." *Enhancement*, Collins, https://www.collinsdictionary.com/us/dictionary/english/enhancement (last visited Mar. 16, 2022).  Merriam-Webster does not provide a definition of "enhancement" (the noun), but only of the verb "enhance," which is to "heighten" or "increase," especially "to increase or improve in value, quality, desirability, or attractiveness."  *Enhance*, Merriam-Webster, https://www.merriam -webster.com/dictionary/enhance (last visited Mar. 16, 2022).  The common characteristic between these two definitions is "improvement."  "Improvement," however, is not an ideal interpretation of this term, because it would conflate the word "improvement" with "enhancement" thus rendering the phrase "inventions, discoveries, improvements, or enhancements" redundant.  *USX Corp*., 444 F.3d at 200; *Sparler v. Fireman's Ins. Co. of Newark, N.J.,* 521 A.2d 433, 438 (Pa. Super. 1987).

Given that the plain meaning of the term does not serve up an answer to the question of

---

[7] TNI also cites what it believes is inconsistent deposition testimony on the meaning of the term to support its claim of ambiguity.  But, as stated *supra,* deposition testimony that does not raise a "reasonable *alternative* semantic reference" for a term cannot be used to decide whether a term is ambiguous.  The testimony TNI cites to does not suggest an alternative to the plain meaning of "enhancement."  Indeed, Walton testified that he used the word in "layman's terms," to mean "when it does something extra to the program," while Lessig's statement—that an "enhancement" would "add an additional" capability to the software, similarly does not present an alternative to the plain meaning.

whether the word "enhancement," is ambiguous or not ambiguous, one turns to the principle of contract interpretation that "a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons." *Com. ex rel. Kane v. UPMC*, 129 A.3d 441, 464 (Pa. 2015) (quoting *Maloney v. Glosser*, 235 A.2d 607, 609 (1967)).

TNI notes that the word "enhancement" is included elsewhere in the SLA, as in "Optional Enhancements" and "Standard Enhancements," which in turn are defined as "improvements, additions and revisions to the Licensed Software" to be provided by FIS. TNI argues, without further explanation, that these definitions are unhelpful and "circular" in nature. FIS, on the other hand, sees the terms "Optional Enhancements" and "Standard Enhancements" as providing additional context to the word "enhancement" rather than obfuscating it. It argues that because the "Optional" and "Standard" Enhancements both contain references to "additions . . . to the Licensed Software" within their definitions, "enhancements" must also include some form of "additions" to the Profile Software.

Both definitions for the terms "Standard Enhancements" and "Optional Enhancements," include the phrase "improvements, additions and revisions." As just explained, "enhancement" should not mean "improvement" in this instance, as the phrase in Section 4.1 would be rendered redundant. Ultimately, "improvement" and "enhancement" are unambiguous. "Improvement" means "a betterment"; "enhancement" refers to an "addition" and/or "revision."[8]

---

[8] The parties also engage in a spat about a term not found in the SLA: "Profile Customizations." FIS coins the phrase and states that it is shorthand for the various terms which go to what FIS owns. TNI makes a ruckus arguing that FIS's "entire Motion is predicated" on the term, that it is ambiguous, and that it is an outright attempt to circumvent and conflate the language of the Agreements. FIS responds that it simply used the term "Profile

22

### C.  Application to Claims

To recap:  as found in the SLA, the terms "Licensed Software," "Derivative Works," "acquire," "portion," "improvements," and "enhancements" are not ambiguous, but the term "capable of running independently of the Licensed Software" is.  This holding has consequences as to whether summary judgment can be granted on the parties' claims regarding ownership.

### i.   *TNI's Request for a Declaratory Judgement that it Owns the TBS Software*

FIS's request to grant summary judgment against TNI with respect to TNI's request for a declaratory judgment that TNI owns the TBS Software turns on whether such software is "Other Software," which, as discussed, is defined by the SLA as software that "(a) [TNI] has acquired at [its] expense, (b) is capable of running independently of the Licensed Software, and (c) does not include any portion of the Licensed Software."  Given the ambiguity of "capable," the Court cannot decide what the term means, much less whether the TBS Software is indubitably "capable of running independently" of the Profile Software.  *Am. Eagle Outfitters*, 584 F.3d at 587.

Further, although the word "portion" is unambiguous (meaning "a part"), the parties dispute whether the TBS Software in fact contains a "portion" of the Profile Software.  FIS's expert, Jeffrey Walton, opines that the TBS Software does contain such portions; TNI's expert, Monty Myers, and its fact witness, Intraha,[9] conclude the opposite.

---

Customization" as a shorthand in its Motion to refer to the various terms which go to what FIS owns. Regardless of the manner in which "Profile Customizations" is used, it is simply not relevant to this analysis, as it does not appear in the contract.

[9] The Court previously excluded the expert testimony and declaration of Intraha.  (ECF No. 216).  As noted in the subsequent order denying TNI's Motion for Reconsideration of that decision, however, it did not consider whether Intraha's declaration could be admissible as the testimony of a fact witness.  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in

Nor is it undisputed whether TNI "acquired [the TBS Software] at [its] expense." As discussed *supra*, "acquire" is unambiguous, and encompasses the definition "gained by or as a result of effort or experience."

In its briefing, TNI asserted that, as a factual matter, it did "acquire" the TBS Software because it developed the software through the work and efforts of its employees. FIS did not directly respond to this point. Rather, it insisted that TNI's understanding of the word "acquired" was incorrect, and that TNI did not "acquire" the software because Chaisinthop testified that it did not "acquire [the TBS Software] from somewhere else," but rather "built and developed [it]." These arguments do not permit a finding of disputed material fact, but neither do they confirm the absence of a dispute; the briefs simply reveal two parties talking past one another. Because the fight centered on the interpretation of "acquire," FIS never addressed TNI's evidence of acquisition through development. Whether TNI gained the software as a result of its efforts is thus a factual issue reserved for the jury. *See, e.g., Fabral, Inc. v. B&B Roofing Co.*, 773 F. Supp.2d 539, 551 n.12 (E.D. Pa. 2011) (reserving issues unaddressed by a party at summary judgment for trial).

Ultimately, because there are genuine disputes of material fact as to all three

---

evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A declaration may be considered on summary judgment when it is made under penalty of perjury and dated. *United States ex rel. Doe v. Heart Sol.*, PC, 923 F.3d 308, 315 (3d Cir. 2019) (citing 28 U.S.C. § 1746). Intraha's declaration was made under the penalty of perjury, dated and attached as an exhibit to TNI's brief. His declaration is thus admissible to the extent that it rests on facts that are within his personal knowledge, including his more than 20 years of experience working with the Profile Software, and his work as a developer of the TBS Software. However, two portions of the declaration may not be considered. First, any discussion or reliance on the TBS Software modules TN1-2 and TN3-7 may not considered because evidence of those modules has been excluded by prior order (ECF No. 116). Second, any portions of the declaration that rest on Intraha's opinion as an expert are not admissible, per the Court's order on the Intraha *Daubert* motions.

24

characteristics of "Other Software," FIS' Motion for Summary Judgment cannot be granted as to TNI's request for a declaratory judgment that it owns the TBS Software.

> ### ii.    FIS's Request for a Declaratory Judgment that it Owns the TBS Software

Turning now to FIS's Motion for Summary Judgment on its own request for a declaratory judgment that it, rather than TNI, owns the TBS Software.  The SLA provides that "[FIS] shall be the sole owner of all . . . improvements[] or enhancements relating to the [Profile Software], including without limitation . . . Derivative Works."  FIS contends that it owns the TBS Software because it is either a "Derivative Work," or some kind of other "improvement" or "enhancement" not explicitly listed in the contract's non-exhaustive list of intellectual property, the rights to which are retained by FIS.  Notably, unlike the "Other Software" definition, the provision of the SLA governing FIS's ownership is disjunctive, rather than conjunctive in nature.  Therefore, for FIS to win on this component of its summary judgment motion, there must be an absence of a genuine dispute of material fact as to whether the TBS Software is a "Derivative Work" or some other kind of "improvement" or "enhancement" of the Profile Software.

Further, because FIS bears the burden of proof on its own Counterclaim at trial, summary judgment should not be granted "unless a reasonable juror would be compelled to find [FIS's] way on the facts needed to rule in its favor on the law." *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "[I]f there is a chance that a reasonable factfinder would not accept [FIS's] necessary propositions of fact, pre-trial judgment cannot be granted." *Id.*

> ### a.    "Improvement" or "Enhancement"

FIS first argues that the TBS Software is an "improvement" or "enhancement" to the

Profile Software simply because TNI's own engineers who developed the TBS Software testified as such.

For example, FIS cites the 30(b)(6) deposition testimony of Intraha, in which he stated that "T.N. Business Solutions is part of [an] improvement for the Profile banking solution." FIS also cites the testimony of Kittiphat Patanathaworn, who answered in the affirmative when he was asked whether certain TBS Software modules are "enhancements to [the] Profile [Software]." But there is some softness in exactly what Intraha and Patanathaworn meant when they so testified. TNI correctly notes that both witnesses expressed confusion about what these terms mean when translated from English to the witnesses' mother tongue, Thai. For example, shortly after he testified that the TBS Software was an "improvement" to the Profile Software, Intraha stated that what he really meant was that certain modules were "add-ons" to the Profile Software, without explaining what this term means. He also noted earlier in his deposition that there might have been an issue translating the word "improvement" into Thai. Patanathaworn's deposition testimony was similarly mixed, if not more so. Although he did at times answer that certain modules of the TBS Software were enhancements to the Profile Software, he also testified to the contrary at others. Further, in support of its Opposition to Summary Judgment, TNI attached a declaration from Patanathaworn, in which he swears under penalty of perjury that he did not know what "enhancement" meant in the deposition due to an issue in translation.

The confusion not only raises credibility issues: what weight should be given to Intraha and Patanathaworn's muddled testimony is inherently a question of believability; but, more importantly for our purposes here, it raises factual disputes about what the parties meant when they used these terms.

26

b.   <u>"Derivative Work"</u>

FIS also argues that the TBS Software is a "Derivative Work" of the Profile Software.[10]
TNI contests all of FIS's points, of course.  Its main contention is that none of FIS's evidence is
actually determinative of ownership.

Specifically with respect to TBS Software modules 1 and 2, FIS argues that it owns them
because those modules operate in the same runtime environment as the Profile Software and, like
the Profile Software, are written in Profile Scripting Language ("PSL").  TNI counters that
PSL does not operate exclusively with the Profile Software, and that, moreover, various TBS
Software modules are written in other programming languages, such as Java.[11]  FIS then argues
that modules 1 and 2 contain file names with a "z" prefix, which is FIS's naming convention for
denoting files that modify the Profile Software source code.  In turn, TNI asserts that "z" prefixes
in file names have nothing to do with modification of the Profile Software source code.  Citing to
the declaration of Intraha (who was one of the key developers of the TBS Software), TNI argues
that the only reason files in the TBS Software have names with "z" prefixes is simply because
FIS instructed TNI to so name the files when TNI was developing the software.  Contrary to
FIS's assertion that these files incorporated or modified the Profile Software source code, Intraha
attests that they were made by TNI "without including or relying on any Profile Software source

---

[10] As discussed *supra*, "Derivative Work" means, in relevant part, "any source code development . . . which
incorporates or modifies any source code delivered by [FIS] as part of the Licensed Software or which relies on any
[FIS] trade secrets which are discerned directly from such source code."

[11] TNI also argues that the fact that software operates in the same runtime environment as the Profile Software is not
indicative of ownership, citing to the Intraha declaration.  But those portions of the declaration discussing runtime
environments do so from the perspective of Intraha as an expert, rather than as a fact witness, and thus have been
excluded.  Those opinions are thus not considered.

code."

With respect to TBS Software modules 5 and 6, FIS argues that it owns them because

those modules: (1) contain FIS copyright notices; and, (2) contain files generated by the Profile

Software tool DATA-QWIK.  TNI's primary response to these points is that the files FIS

identifies in making these arguments are not relevant, because they are not ones over which TNI

claims ownership.[12]  FIS then points to "other evidence" in modules 5 and 6, which purportedly

show that components of the TBS Software are so heavily integrated with the Profile Software

that the TBS Software must be a "Derivative Work."  FIS's point involves a long list of technical

arguments.  TNI's rebuttals to these arguments at times rely on portions of the Intraha

declaration which are drawn from his personal knowledge working on the software at issue (and

is thus permissible and considered), and others which do not (and are thus not considered).[13]

---

[12] As explained in the *Daubert* opinion, TNI originally provided to FIS a description of the TBS Software in an "Appendix A" to an interrogatory response, which consisted of a 159-page list of file names.  At some point thereafter, TNI supplied FIS with an amended "Appendix A," which deleted a handful of file names from the list. TNI asserts that FIS's arguments about copyright notices and DATA-QWIK are misplaced because those arguments only center around those file names deleted from the Appendix A, *i.e.* those files TNI no longer asserts form part of the TBS Software.

TNI also responded to FIS's argument about copyright notices by stating that "simply entering a copyright notice, which anyone can do, has no legal effect."  But it cites to no legal authority in support of this proposition.  Absent such, the argument is waived.  *See* Eastern District of Pennsylvania Local Civil Rule 7.1(c) (each motion "shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion"); *see also Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("An argument consisting of no more than a conclusory assertion . . . will be deemed waived").

Finally, as to FIS's point about DATA-QWIK, TNI argued that using DATA-QWIK to build software is not indicative of ownership, citing to the Intraha declaration.  But again, those portions of the declaration discussing DATA-QWIK do so from the perspective of Intraha as an expert, rather than as a fact witness.  Such opinions are therefore not considered.

[13] TNI also argues that FIS has not shown that the TBS Software is a "Derivative Work" because it has purportedly not identified any "[FIS] trade secrets" in the TBS Software.  But FIS stated in its Motion that "TN6.1 . . . depends on numerous Profile trade secrets, such as pre-existing Profile [Software] tables that are created in the Profile

In the course of the parties' detailed and extensive technical arguments—in support of which they reference exhibits, deposition testimony and expert opinions—as to why the other's position is wrong, numerous genuine issues of material fact are aired that preclude summary judgment on the question of whether the TBS Software is a "Derivative Work" of the Profile Software.

### D. TNI's Breach of SLA Claim

Along with the ownership claims, FIS also moves for summary judgment on Count Eleven of TNI's Amended Complaint, in which TNI alleges that FIS breached Section 4.2 of the SLA by contacting TNI's bank customers and improperly asserting "a sweeping position with respect to the ownership of TNI Business Solutions", to wit, that it owned the TBS Software.

The parties agree that shortly after the Agreements were discontinued, FIS sent letters to four of TNI's bank customers, stating that FIS owned "any/all the intellectual property rights in and to any customizations, enhancements, modifications that may have been made to the Software created by [TNI]."  In addition, FIS also sent subsequent letters to those customers stating, "we submit language from the distribution agreement between FIS and [TNI] to confirm FIS' ownership of any customizations, enhancements, modifications, or changes made to the Software (collectively 'Derivative Works')."  TNI claims that by contacting TNI's banking customers and claiming ownership of the TBS Software, FIS breached Section 4.2 of the SLA,

---

database."  FIS has thus identified trade secrets for purposes of making its point.

Moreover, and as discussed *supra*, FIS's claim does not hinge entirely on its identification of trade secrets.  FIS may also prove that the TBS Software is a "Derivative Work," by showing that it "incorporates or modifies any source code delivered by [FIS] as part of the Licensed Software."  And FIS may also prove that it owns the TBS Software by showing that it is an "enhancement" or "improvement" of the TBS Software.

which states:  "[t]he parties acknowledge and agree that the terms and conditions of this Agreement are not intended to apply to Other Software nor does [FIS] assert any ownership in or responsibility for any Other Software."

FIS argues that summary judgment should be granted on this claim because (1) its letters to TNI's clients do not mention the phrase "Other Software," and, (2) the TBS Software does not constitute "Other Software."[14]  But both of these arguments are premised on the assumption that the term "Other Software" is clear, which it is not.  As discussed *supra*, the definition of Other Software in the SLA includes software that is "capable of running independently of the Licensed Software," and the term "capable" is ambiguous—thus rendering the term "Other Software" ambiguous as well.  Consequently, whether FIS violated this provision or not turns on what "Other Software" means, which must be decided by the jury.

FIS further argues that summary judgment should be granted on TNI's claim because the SLA contains a limitation on liability that precludes lost profit damages, which FIS believes are the only kinds of damages TNI has delineated in support of this claim.  In the alternative, FIS argues that any damages TNI may incur in this litigation should be capped at $100,000, due to a provision in the SIDA which precludes TNI from recovering any damages in excess of that amount.  Summary judgment, however, cannot be granted on this ground because regardless of what damages are provided for in the Agreement, TNI may nevertheless be able to obtain nominal damages.  In short, if a plaintiff is able to prove a breach of contract, but can show no

---

[14] FIS also contends that summary judgment should be granted on this claim because Section 4.2, which is a "standard contractual disclaimer" does not create an obligation on its part.  But it cites to no legal authority and provides no cogent argument in support of this proposition.  Absent such, the argument is waived.  *See* Eastern District of Pennsylvania Local Civil Rule 7.1(c); *see also Reynolds*, 128 F.3d at 178 (3d Cir. 1997).

damages flowing from the breach, the plaintiff is nonetheless entitled to recover nominal damages. *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 931 (Pa. Super. 1984); *see also Scobell Inc. v. Schade*, 688 A.2d 715, 719 (Pa. Super. 1997) (quoting *Aiken Indus., Inc. v. Est. of Wilson*, 383 A.2d 808, 811-12 (1978)).

Therefore, "[a] grant of summary judgment on the sole basis of absence of provable damages, . . . is generally improper." *Thorsen*, 476 A.2d at 931. "Federal courts applying Pennsylvania law have agreed with the impropriety of summary judgment in such a situation." *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 497-98 (3d Cir. 2015); *see, e.g., Tradex Europe SPRL v. Conair Corp.*, 2008 WL 1990464, at *5 (S.D.N.Y. 2008) (denying summary judgment because nominal damages were not precluded by existence of limitation of liability clauses). FIS's arguments about the SLA's limits on liability therefore do no warrant granting summary judgment on TNI's claim.[15]

## IV.       TNI'S MOTION FOR SUMMARY JUDGMENT

Turning now to TNI's Motion for Summary Judgment which concerns: FIS's Counterclaim for breach of the SLA, FIS's Counterclaim for breach of the SIDA, and FIS's Counterclaim for breach of the MACS.

### A. Breach of Confidentiality

#### i.   *Scope of Theories*

Consideration is first made of FIS's counterclaims that TNI breached the confidentiality

---

[15] This point also precludes TNI's request for summary judgment on all three of FIS's claims on the grounds that: (1) the damages FIS seeks are too speculative; (2) the Agreements contain provisions which limit the liability of the parties, and thus preclude lost profit damages; and, (3) FIS allegedly failed to identify damages that flow from false statements TNI allegedly made about its products.

provisions of all three Agreements.  TNI, looking to the allegations of the pleadings underpinning these "confidentiality breach" counterclaims, assumes in its Summary Judgment Motion that they are founded on TNI's disclosure of confidential information to outside developers while creating the TBS Software.  Its Motion for Summary Judgment on these Counterclaims features an argument that they are each barred by the statute of limitations and, in the case of the MACS, by a contractual bar on any action arising more than two years after a cause of action arose.  TNI argues that the claims are so barred because FIS knew of—and actually condoned—TNI's development of the TBS Software and its concomitant sharing of confidential information in the course of that development.  FIS's failure to notify TNI in a timely manner that it considered such actions to be a breach of the confidentiality provisions of each contract thus puts an end, in TNI's view, to any claims premised on those provisions.

Rather than respond to these arguments, FIS takes a sidestep—asserting that TNI's development of the TBS Software is simply not what FIS's counterclaims "are about."  Instead, it avers that its confidentiality breach Counterclaims concern: (1) TNI's disclosure of confidential information to Finxact and YottaDB; and, (2) TNI's use of confidential information while "servicing the Profile Software."  In other words, FIS's new theories are not concerned with disclosures made by TNI to software developers it was working with on the TBS Software—instead, the new theories refocus FIS's accusations to disclosures of confidential information made by TNI: (1) to FIS's competitors; and, (2) to TNI's banking clients while providing services related to the Profile Software.

TNI did not address these theories anywhere in its opening brief because, as it asserts in its Reply brief, it had no reason to believe that FIS's confidentiality breach Counterclaims were

premised on these theories, as they are nowhere to be found in the Counterclaims.  Not so fast, says FIS.  Although FIS did not set forth the theories in its Counterclaims, the theories emerged as discovery progressed.  Specifically, after the court ordered TNI to produce documents related to its involvement with Finxact and YottaDB, FIS learned that there was more to its confidentially breach counterclaims than it understood at the time it filed its pleading.  Accordingly, on April 29, 2021, 88 days before the close of discovery, 52 days after the Court ordered production of the Finxact and YottaDB documents, and 116 days before summary judgment motions were due, it supplemented its interrogatory responses to TNI's contention interrogatories which asked FIS to "identify and describe the basis for Defendants' Counterclaim[s]" of the SLA, the SIDA, and the MACS, respectively.

In its supplementary interrogatory responses, with respect to the SLA, FIS explained, *inter alia*, that TNI breached this agreement by: "disclos[ing] FIS's trade secrets and other confidential information to third parties including its outside developers and entities in which TNI owns and interest and/or customers without FIS's permission."  With respect to the SIDA, FIS explained that TNI breached this agreement by:  "improperly us[ing], disclos[ing], and/or cop[ying] confidential information of FIS in the development of software to compete with the Profile Software"; and "improperly us[ing], disclos[ing], and/or copy[ing] confidential information of FIS, including about the Profile Software or databases thereof, in conjunction with the maintenance, support, installation testing and/or operation of the Profile Software or related technologies."  Finally, FIS explained that TNI breached the MACS by: disclosing confidential information while "develop[ing] and market[ing] competing software on behalf of third parties"; and failing to notify FIS of any disclosure of confidential information that may

33

have occurred while TNI developed the TBS Software and competing core banking software.

Accordingly, TNI knew that FIS was pursuing these theories in its confidentiality breach Counterclaims before it filed its summary judgment briefs—but chose not to address them.  To explain its omission, TNI argues that its Motion only needed to address "allegations actually pled by FIS in its Counterclaims."  It attributes the mismatch of theories—the one it seeks to debunk in its Motion for Summary Judgment versus the ones espoused by FIS in its responsive brief—to FIS's "attempt[] to distract the Court by raising issues that are not relevant to TNI's Motion."  But TNI's excuse for the oversight is belied by the fact that its Motion—*citing FIS' supplemental responses*[16]—addresses some of FIS's newly-supplemented theories (such as TNI's efforts in recruiting former FIS employees) but does not address the confidentiality theories.  The concern is, of course, that TNI is deliberately blinding itself to those theories that are not easily disposed of on summary judgment but which FIS signaled it was pursuing in its supplementary response to TNI's contention interrogatories.

At this point, it is useful to take a small diversion into the distinction between theories supporting a claim and the claim itself, as that distinction is the fulcrum on which the question of whether to grant or deny TNI's request to grant summary judgment on FIS's confidentiality breach Counterclaims pivots.  Of central importance is that the Federal Rules of Civil Procedure

---

[16] For example, when addressing FIS's recruitment theory, TNI explicitly states that "FIS has asserted in answers to interrogatories that TNI breached one or more of the Profile Agreements in that it alleged [TNI] '[a]ided and abetted [Finxact and YottaDB] in identifying and recruiting FIS employees.'"  TNI cites to paragraph 147 of its attached Statement of Material Facts, which in turn has a citation to FIS's Second Amended (supplemental) interrogatory responses.

only require parties to plead claims at the pleading stage, not theories.[17]  5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1219 (4th ed. 2021); *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992) ("The complaint need not identify a legal theory, and specifying an incorrect theory is not fatal.").  A legal "claim" is commonly defined as "[a]n interest or remedy recognized at law" or "the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing."  *Claim*, Black's Law Dictionary (11th ed. 2019).  On the other hand, a "legal theory" is defined as "the principle under which a litigant proceeds, or on which a litigant bases its claims or defenses in a case."  *Legal Theory*, Black's Law Dictionary (11th ed. 2019).

In drafting a pleading, a party "need only state a set of facts giving rise to a claim, and not the legal theory behind the claim, so long as the [other party] has enough information to frame an answer and to commence discovery."  *Barlow v. Pep Boys, Inc*., 625 F. Supp. 130, 132 (E.D. Pa. 1985) (citing *Moorish Sci. Temple of Am., Inc. v. Smith*, 693 F.2d 987, 989 (2d Cir. 1982)).  Thus, parties are not strictly tied to the legal theories articulated in their pleadings, as long as the other side is not prejudiced by a change in or addition to their theories.  *See Ridings v. Riverside Med. Ctr*., 537 F.3d 755, 764 (7th Cir. 2008) (considering on appeal legal theory for statutory breach that was not raised in the complaint); *c.f. Ragland v. Comm'r N.J. Dep't of Corr*., 717 F. App'x 175, 179 n.4 (3d Cir. 2017) (no prejudice in district court's consideration of

---

[17] Support for this point can be found in the Rules themselves, which only speak in terms of "claims"—not "theories."  For example, Federal Rule of Civil Procedure 8(a) requires a complaint to state "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  Rule 8(d) discusses assertions of "claim[s]" that may be made "alternatively or hypothetically" in pleadings.  Fed. R. Civ. P. 8(d).  Rule 12(b)(6) allows dismissal for "failure to state a claim."  Fed. R. Civ. P. 12(b)(6).  Finally, Rule 13 addresses the pleading of counterclaims and crossclaims—and discusses them in terms of "claims," not "theories."  Fed. R. Civ. P. 12(b)(6).

a new claim raised for the first time in response to summary judgment motion, where both parties briefed the issue).

TNI implies that it was prejudiced by FIS raising new theories in opposition to summary judgment. But FIS's response to TNI's Summary Judgment Motion was not the first time it raised these issues. After TNI—pursuant to a court order—finally produced documents regarding its interactions with Finxact and YottaDB, FIS supplemented its interrogatory responses to include the theory that TNI improperly disclosed confidential information to these entities. FIS's supplemental responses also advanced a theory of breach of confidentiality "in conjunction with the maintenance . . . of the Profile Software or related technologies." Because TNI had notice of these theories months before the end of discovery, it cannot make (and does not attempt to make) any arguments that it has actually been prejudiced by FIS's recourse to these theories on summary judgment.[18]

FIS thus timely raised the breach of confidentiality theories focused on TNI's disclosure of confidential information to Finxact and YottaDB and TNI's use of confidential information while servicing the Profile Software. Because TNI did not address these theories in its opening brief, it has waived any arguments as to whether they should survive summary judgment. *Laborers' Int'l Union*, 26 F.3d at 375, 398 (3d Cir. 1994) ("An issue is waived unless a party

---

[18] The cases cited by TNI in support of its position are not only not precedential, but distinguishable, because FIS's theories were raised sufficiently early in the case to give TNI notice and an opportunity to respond. *See Myservice Force v. Am. Home Shield*, 2013 WL 180287, at *11-12 (E.D. Pa. Jan. 17, 2013) (excluding legal theory of oral contract alleged for first time in opposition to summary judgment because record contained no notice of it); *Sweet St. Desserts, Inc. v. Better Bakery, LLC*, 2015 U.S. Dist. LEXIS 95913, at *19 (E.D. Pa. July 23, 2015) (refusing to consider new claim for breach of oral contract where complaint only mentioned written contract).

raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'" (citation omitted) (ellipsis in original)), *cert. denied*, 513 U.S. 946 (1994).[19]

### ii.    *Merits of Theories*

In summary, FIS's confidentiality breach counterclaims are premised only on its theories that TNI breached the Agreements by sharing confidential information: (1) with YottaDB and Finxact, and, (2) while servicing the Profile Software without a license.[20]  TNI does argue, untethered to any particular theory, that summary judgment should be granted on these claims because FIS did not identify with particularity the trade secrets TNI allegedly disclosed.  But this reference to trade secret law is misplaced.  None of the Agreements by their terms limit "Confidential Information" to trade secrets.[21]  TNI does not cite to any law to suggest that they

---

[19] TNI raised other arguments as to why FIS's newer breach of confidentiality theories fail in its Reply Brief, but its failure to address the theory in its opening brief was not cured by addressing them in a reply brief.  *Id.*

[20] In its Counterclaims, FIS also alleged that TNI breached the SLA by: copying parts of the Profile Software while developing the TBS Software; using the TBS Software to process data or accounts for anyone other than permitted users; failing to keep the Profile Software in a secure location; failing to keep the Profile Software free and clear of claims; failing to notify FIS of unauthorized use of the Profile Software while it developed the TBS Software; and failing to return copies of the Profile Software (including the TBS Software) upon termination of the Agreements. FIS also alleged that TNI breached the MACS by failing to notify FIS of unauthorized use of the Profile Software while it developed the TBS Software and using and distributing the TBS Software.  Because FIS failed to address any of these theories of breach in its summary judgment papers, however, it concedes that it is no longer pursuing such theories, and may not be permitted to do so at trial.  *Laborers' Int'l Union*, 26 F.3d at 398.

[21] The SIDA defines "Confidential Information" as "information of a proprietary or confidential nature . . . including without limitation technical information, sales information, financial data and trade secrets."  The SLA and the MACS both define "Confidential Information" as "tangible and intangible information including but not limited to . . . business/customer information, business practices and trade secrets, computer software and all related Documentation, obtained, developed or disclosed to the other party in connection with this Agreement."  To support its confidentiality claims, FIS identified information that it believes TNI disclosed, including:  the source code of the Profile Software, along with customization guidelines, technical specifications, and other documentation to assist with the implementation of the Profile Software.  These types of information clearly fall within the scope of the contracts.  Because FIS has sufficiently identified "Confidential Information" that it contends TNI disclosed

should.  Moreover, while FIS has pled trade secret claims, those claims are reserved for Phase 2 of this litigation.

a.   <u>Open Source Exception</u>

TNI next argues that it did not breach the Agreements because "major parts" of the Profile Software are open source,[22] and none of the Agreements extend the obligation to keep information confidential to open source information.  TNI therefore submits that, to the extent FIS's counterclaims are based on publicly available information, they fail as a matter of law.

TNI's argument does not dispose of FIS's Counterclaims.  Although portions of the Profile Software may be open source, all parties agree that other parts of the Profile Software constitute FIS's confidential information.  The question is whether TNI disclosed the latter.  *See, e.g., Communique Lab., Inc. v. Citrix Sys*., 151 F. Supp.3d 778, 798 (N.D. Ohio 2015) (recognizing that parts of a software application's source code may be confidential even if it also includes open source code).  Because there is a factual dispute as to which parts of the Profile Software are open source, which are subject to the Agreements' confidentiality provisions, and what exactly was disclosed, summary judgment cannot be granted on FIS's confidentiality breach Counterclaims.

**B.  Other Breaches of the SIDA**

*i.   Breach of "Best Efforts" Clauses*

The SIDA contains two "best efforts" clauses, which provide in relevant part that TNI

---

contrary to its obligations under the Agreements, summary judgment will not be granted on this ground.

[22] "Open source loosely describes software that is created free of proprietary rights and royalty restrictions." Richard Stim, *Patent, Copyright & Trademark: An Intellectual Property Desk Reference*, 282 (15th ed. 2017).

must:  (1) "use its best efforts to promote, market, advertise, and license the [FIS] PRODUCTS within [Thailand]"; and, (2) "[u]se its best efforts to promote the overall reputation and good will of [FIS]."  FIS argues that TNI failed to use its best efforts to promote the Profile Software by refusing to bid with FIS on various banking projects and by redirecting contracts to itself.[23]  TNI responds that it exercised its sound business judgment when refusing to bid on certain projects with FIS, and thus did not breach the SIDA.  It cites to the declaration of Chaisinthop, who stated that TNI declined to participate in the bids because "it was [his] business judgment that the opportunities did not make commercial sense for TNI" due to "a protracted bidding processes with rigid conditions and ambiguous requirements."  FIS disputes the facts asserted in the declaration, and argues that any determination of whether TNI satisfied the Best Efforts clauses implicates the credibility of fact witnesses such as Chaisinthop.[24]

   A breach of a contractual promise to use best efforts is actionable under Pennsylvania

---

[23] Although FIS alleged in its Counterclaims that TNI also breached the SIDA's best efforts clauses by making false statements about FIS to its customers, FIS clarified in its Opposition that it does not pursue a distinct theory of breach by false statements, but rather, it merely plans to use evidence of the alleged false statements to bolster its other theories of breach.

[24] FIS also argued in its Opposition that TNI breached the SIDA's "best efforts" clauses by servicing the Profile Software to banks without a license, a theory TNI asserts (in its Reply) was raised only for the first time in FIS's Opposition.

A review of FIS's supplemental interrogatory responses reveals that, while it did assert that TNI "improperly used . . . *confidential information of FIS* . . . in conjunction with the maintenance . . . of the Profile Software," it never asserted that TNI's maintenance of the Software was a breach of the SIDA absent TNI's disclosure of confidential information in the process.  TNI is thus correct that it was not put on notice of this theory prior to seeing FIS's Opposition to its papers.  As a result, TNI would be prejudiced by FIS's articulation of this theory of breach if it were addressed for the first time now.  *Barlow v. Pep Boys, Inc*., 625 F. Supp. 130, 132 (E.D. Pa. 1985).  To avoid further prejudice, FIS will not be permitted to pursue its theory that TNI breached the "best efforts" clause of the SIDA by servicing the Profile Software at banks for the remainder of the litigation.  *See, e.g., Myservice Force*, 2013 WL 180287 at *11-12.  It will, however, still be permitted to pursue its theory that TNI breached the SIDA's confidentiality clause by servicing the Profile Software.

law.  *See Bailey v. Tucker*, 621 A.2d 108, 115 (Pa. 1993).  "Precedent treats 'best efforts' as a form of good faith and sound business judgment."  *Martin v. Monumental Life Ins. Co*., 240 F.3d 223, 234 (3d Cir. 2001).  "'Best efforts' depends on the factual circumstances surrounding an agreement," *id.* at 233, and therefore often presents a question of fact for the jury.  *See Huang v. BP Amoco Corp*., 271 F.3d 560, 565 (3d Cir. 2001) ("Under Pennsylvania law, whether a party has made a good-faith effort is a question of fact.")  Given that "the determination of what is 'commercially reasonable' involves a fact-intensive inquiry, dependent of the totality of the circumstances, and calls for an examination of the particular situation," summary judgment will not be granted on this ground.  *In re Am. Home Mortg. Holdings, Inc*., 637 F.3d 246, 259 (3d Cir. 2011) (Rendell, J., concurring); *Coolspring*, 10 F.3d at 148.[25]

### ii.    Breach of Non-Compete Clause

Section C of the SIDA provides that TNI shall "[n]ot directly or indirectly represent, distribute, market, develop or invest in any products or entities which are in direct competition with the [FIS] PRODUCTS, except as may be mutually agreed by the parties."

FIS argues that TNI breached this provision by "work[ing] extensively with banking software startups Finxact and YottaDB to develop and promote core banking software and services that compete with FIS' Profile Software, and invest[ing] in these same companies."[26]

---

[25] FIS also argues in its Opposition that TNI breached a provision of the Software Marketing and Distribution Agreement (Counterclaim VIII) that requires TNI to "make its best efforts to market the [FIS] Programs in [Thailand] and to solicit orders for the [FIS] Programs from prospective End Users located within [Thailand] in those circumstances in which the Programs are appropriate for the End User's Needs."  But the Bifurcation Order in this case makes clear that breach of that agreement is reserved for Phase 2 of this litigation.  FIS's argument therefore properly belongs in subsequent briefing.

[26] FIS also pled in its Counterclaims that TNI breached the SIDA's non-compete clause by promoting and developing the TBS Software as a substitute for the Profile Software.  TNI addressed this theory in its Motion for

As a threshold matter, the parties dispute whether Finxact and YottaDB or their products are in "direct competition with [FIS] Products."  Summary judgment therefore cannot be granted on this claim.  *Adickes*, 398 U.S. at 157.

### C.  Breach of SLA's Non-Solicitation Clause

FIS's claim for breach of the SIDA also concerns TNI's alleged breach of the non-solicitation provision, which provides in relevant part:

> During and for a period of one (1) year following termination of this Agreement, neither party will without consent of the other party, hire or attempt to hire any employee of the other party involved in performance of services under this Agreement, provided, however, that it shall not be considered a breach of this provision should either party hire an employee of the other as a result of such employee's response to a job advertisement or such employee's independent unsolicited inquiry regarding job opportunities.

FIS alleges that TNI breached this provision when it "assisted Finxact and YottaDB to recruit or attempt to recruit key FIS employees."  TNI does not raise any legal arguments regarding the scope of the non-solicitation clause.  Instead, it asserts that—as a factual matter—it did not employ any FIS employees or assist Finxact or YottaDB in employing any FIS employees.   FIS disputes this assertion, citing to emails and deposition testimony suggesting that Chaisinthop and Frank Sanchez discussed recruiting former FIS employees for Finxact. Summary judgment will therefore not be granted on this claim, as there exists a genuine dispute of material fact to be resolved by a jury.  *Adickes*, 398 U.S. at 157.

---

Summary Judgment.  FIS, however, failed to address it at all in its Opposition, focusing instead on TNI's assistance in developing Finxact and YottaDB's products.  FIS thus waives any arguments related to this theory, and will not be permitted to pursue this theory for the remainder of the litigation.  *Laborers' Int'l Union*, 26 F.3d at 398.

*****

## V.        CONCLUSION

Based on the foregoing, both parties' Motions will be denied in their entirety.  An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**